SUMNER v THE GOODYEAR TIRE & RUBBER COMPANY
KNIGHT v BLUE CROSS-BLUE SHIELD OF MICHIGAN
ROBSON v GENERAL MOTORS CORPORATION

Docket Nos. 74523, 75109, 75168. Argued February 6, 1986 (Calendar Nos. 3-5). Decided December 30, 1986. Rehearing denied in *Sumner*, 428 Mich 1206.

Daniel Sumner filed a complaint with the Civil Rights Commission under the Fair Employment Practices Act, alleging racial harassment on the job while employed by The Goodyear Tire & Rubber Company and discriminatory discharge following a fight with supervisors which the plaintiff claimed was provoked by the harassment. A hearing referee found harassment and that the complaint was timely filed on the basis of the date of the discharge which the referee held to be the final act of discrimination, but rejected the claim that the discharge was discriminatory because the fight was provoked or because it constituted an example of disparate treatment. The Civil Rights Commission, following a hearing de novo, found that the plaintiff's discharge was based in part on unlawful considerations of race and that the claim was timely, but rejected the claims of harassment as untimely, viewing the discharge not as a part of continuing harassment, but as a separate act of racial discrimination. The Ingham Circuit Court, Jack W. Warren, J., reversed, finding that the acts of harassment and discharge, although separate, amounted to a continuous course of conduct and, thus, that the complaint was timely. The Court of Appeals, CYNAR and MARUTIAK, JJ. (HOOD, P.J., concurring), affirmed in part and reversed in part in an unpublished opinion per curiam, finding the claim of harassment was not timely because the discharge of the plaintiff was not discriminatory, but based on legitimate grounds, and thus the acts of harassment were outside the period of limitation of the FEPA (Docket No. 64819). The plaintiff appeals.

Carolyn Knight brought an action in the Wayne Circuit Court

REFERENCES
Am Jur 2d, Civil Rights § 309.
See the annotations in the Index to Annotations under Discrimination.

under the Civil Rights Act against Blue Cross-Blue Shield of Michigan, alleging discrimination by a supervisor in retaliation for her refusal to respond to his sexual advances and by her employer in failing to investigate her claims of harassment and in forcing her resignation. The plaintiff requested instruction of the jury that with respect to damages the discharge and harassment be considered a continuing violation. The court, Patrick J. Duggan, J., entered judgment for the defendant on a jury verdict of no cause of action because, although the supervisor made unwanted sexual advances to the plaintiff which she rejected, the rejection was not a factor of significant influence in her termination. The Court of Appeals, GRIBBS, P.J., and T. M. BURNS and DEMING, JJ., affirmed in an unpublished opinion per curiam, holding moot the plaintiff's claim of error with respect to the instruction on damages (Docket No. 65666). The plaintiff appeals.

William J. Robson brought an action in the Wayne Circuit Court under the Handicappers' Civil Rights Act against the General Motors Corporation, alleging discrimination in his removal as a test driver, reclassification and transfer, and layoff and that the acts constituted continuing discrimination extending into the limitation period under the act. The court, Michael L. Stacey, J., granted summary judgment for the defendant on the ground that the action was barred by the act's statute of limitations. The Court of Appeals, M. J. KELLY, P.J., and BRONSON and SIMON, JJ., affirmed in an unpublished opinion per curiam, holding that the plaintiff's cause of action accrued on the date he was removed as a test driver, six months beyond the period of limitation (Docket No. 73056). The plaintiff appeals.

In an opinion by Justice BRICKLEY, joined by Justices LEVIN, CAVANAGH, and ARCHER, the Supreme Court *held:*

An alleged actionable act of discrimination on the basis of race, sex, or handicap will allow consideration of damages for connected conduct falling outside an applicable period of limitation which otherwise would be barred but for the continuing violation.

1. The doctrine of continuing violation was developed in federal courts in the context of cases involving Title VII of the federal Civil Rights Act of 1964. That act, like the Michigan acts at issue in these cases, defines and bars unlawful discrimination practices. Although the act originally required the filing of complaints within ninety days of discrimination, federal courts avoided strict application of the limit by noting that many discriminatory acts occur in a manner making it difficult to precisely fix the time of occurrence, and determining that

certain types of discrimination are continuing in nature, requiring measurement of the running of the period of limitation from the last, rather than the first, occurrence of discrimination. Congress implicitly endorsed the doctrine at the time of extending the limitation period to 180 days. The Supreme Court of the United States subsequently recognized the theory in *United Air Lines v Evans,* 431 US 553 (1977), holding that there must be a present violation, a discriminatory act, within the period of limitation to sustain a cause of action and that merely an effect of prior discrimination is insufficient. The Court noted, however, that untimely acts might constitute relevant background evidence in a proceeding in which the status of a current practice is at issue. In the wake of *Evans,* the doctrine was analyzed in terms of three subtheories: policy of discrimination, continuing course of conduct, and present effects of past discrimination. The "present effects" subtheory ceased to be actionable after *Evans.*

2. The continuing violation approach is adopted in Michigan. Applied to these cases:

a. Under the Handicappers' Civil Rights Act, an action is timely when filed within three years after the cessation of a deprivation proximately caused by a discriminatory policy and the policy is applied within the period of limitation. A plaintiff may not claim, however, that any deprivations caused by such a policy continue beyond three years after termination of an employment relationship or an employer's most recent refusal to hire the plaintiff. Thus, in *Robson,* because the defendant's policy, its application, and the resultant deprivation continued well into the period of limitation, and because the occurrences within the period were themselves discriminatory, the grant of summary judgment for the defendant must be reversed.

b. Under the Fair Employment Practices Act, an intentionally provoked discharge can be so intrinsically connected to continuing harassment as to render timely an action for the harassment, even where the persons making the decision to terminate were not improperly motivated. In *Sumner,* while the discharge, the only occurrence within the period of limitation, was ordered by parties not themselves possessing discriminatory intent, it renders the action for harassment timely if the harassment was engaged in for the purpose of causing the discharge, requiring remand to the Civil Rights Commission.

c. Under the Michigan Civil Rights Act, the timely filing of a sexual harassment claim would permit an award of damages for the entire course of discriminatory conduct. Absent a present violation within the limitation period, however, the claim

would be barred by the statute of limitations. In *Knight,* there is no indication in the record that the plaintiff was subjected to unwanted sexual advances or retaliation during the period of limitation. Her discharge from assignment was a neutral act, the present effect of past discrimination, and the claim of failure by the employer to investigate her claims of harassment is not, in and of itself, a violation under the act. There was no error in the jury instruction that there was no liability in the act of discharge in the absence of a finding of discrimination within the period of limitation.

Justice ARCHER, concurring, stated that under the facts of *Sumner* the plaintiff's discharge was part of a continuous course of racial harassment. Under the Fair Employment Practices Act, the statute of limitations did not begin to run until the violation complained of ceased. The act provided that a person claiming to be aggrieved by an unlawful employment practice was required to file a complaint within ninety days following the act of discrimination. Where, as in *Sumner,* an act of discrimination occurred within the period of limitation which was so closely connected to previous discriminatory acts that occurred without the period that the continuing nature of the discrimination was apparent, all the acts of discrimination amounted to a continuing violation, and a complaint filed within ninety days following the last act was timely with respect to all the acts.

*Robson* and *Sumner,* reversed and remanded.

*Knight,* affirmed.

Justice RILEY, joined by Justice BOYLE, concurring in part and dissenting in part, agreed with the adoption of the continuing violation doctrine, but, in applying the doctrine in *Sumner,* would not find a continuing violation. In *Sumner,* the purpose underlying the harassment of the plaintiff was a question of fact, and no findings were made regarding the purpose. Without a finding that the ultimate purpose of the harassment was the plaintiff's termination, there is no link between the discriminatory acts of harassment and the nondiscriminatory termination. Even if the plaintiff could show intentional provocation on remand, there would be no present violation within the limitation period and, thus, no continuing violation. The plaintiff's own actions—his attack on his supervisors—formed the basis of the decision to discharge him. His attack destroyed any link between the harassment and the discharge. Thus, because he brought about the incident which precipitated his discharge, and the discharge was justified and not discriminatory, the intention of the supervisors should not be imputed to the

persons making the decision to discharge. In addition, there is no logical reason to impute a discriminatory purpose to the termination in *Sumner* and to view an essentially identical termination in *Knight* as neutral.

Chief Justice WILLIAMS, concurring in part and dissenting in part, stated that consistent application of the continuing violation theory of employment discrimination should allow all the plaintiffs in these cases to recover. The disparity in application by the majority would appear to be because *Knight* was decided by a special verdict of a jury and *Sumner* and *Robson* by the trial courts. *Knight* should be remanded to the trial court for the fashioning of jury instructions consistent with the continuing violation theory.

1. CIVIL RIGHTS — EMPLOYMENT DISCRIMINATION — CONTINUING VIOLATION.

An alleged actionable act of discrimination on the basis of race, sex, or handicap will allow consideration of damages for connected conduct falling outside an applicable period of limitation which otherwise would be barred but for the continuing violation (MCL 37.1101 *et seq.*, 37.2101 *et seq.*, 423.301 *et seq.*; MSA 3.550[101] *et seq.*, 3.548[101] *et seq.*, 17.458[1] *et seq.*).

2. CIVIL RIGHTS — EMPLOYMENT DISCRIMINATION — CONTINUING VIOLATION.

A discharge of an employee can be so intrinsically connected to continuing discriminatory harassment by superiors which was intended to provoke the discharge as to render timely an action for harassment, even where the persons making the decision to discharge were not improperly motivated (MCL 37.2101 *et seq.*; MSA 3.548[101] *et seq.*).

*Touma, Watson, Nicholson, Whaling, Fletcher & DeGrow, P.C.* (by *Dan L. DeGrow* and *Janet M. Castello*), for plaintiff Sumner.

*Ronald Reosti & Associates, P.C.* (by *Ronald Reosti*), and *Mark Granzotto* for plaintiff Knight.

*Stark & Gordon* (by *Deborah L. Gordon*) and *Mark Granzotto* for plaintiff Robson.

*Dickinson, Wright, Moon, Van Dusen & Freeman* (by *Joseph A. Fink* and *Brian J. Renaud*) for defendant The Goodyear Tire & Rubber Company.

*Karen Smith Kienbaum* and *Kristine J. Galien* for defendant Blue Cross-Blue Shield of Michigan.

*Mark R. Flora (Clark, Hardy, Lewis, Pollard & Page, P.C.,* by *Terence V. Page* and *Neil H. Goodman,* of counsel) for defendant General Motors Corporation.

BRICKLEY, J. These cases come to us on the question of the application of the ninety-day period of limitation under the Fair Employment Practices Act and the three-year period of limitation under the Michigan Civil Rights Act and the Handicappers' Civil Rights Act. They require a first-impression examination of the continuing violation theory, as developed by the federal courts in their interpretation of analogous federal antidiscrimination legislation. We adopt the continuing violation approach, concluding that an alleged timely actionable event will allow consideration of and damages for connected conduct that would be otherwise barred.

I. FACTS

A. *ROBSON v GENERAL MOTORS*

Plaintiff, William Robson, contracted polio as a child and, as a result, was forced to undergo surgery to fuse a number of his vertebrae. This operation left Robson with scoliosis (curvature of the spine). He alleges that the condition constitutes a handicap within the meaning of the Handicappers' Civil Rights Act, MCL 37.1101 *et seq.;* MSA 3.550(101) *et seq.*[1]

Plaintiff was employed by defendant as a test

---

[1] The only question now before this Court is that of the timeliness of Robson's complaint. We express no view as to the sufficiency of his cause of action for handicap discrimination.

driver at the General Motors' proving grounds facility from 1965 to 1978 and performed satisfactorily in that capacity. His scoliosis remained unchanged over the course of these years. During this period, plaintiff underwent periodic physical examinations by General Motors doctors pursuant to a company policy which required an annual review of test drivers' physical conditions to determine if they met certain medical standards outlined in a General Motors policy. Until 1978, Robson passed each of his yearly examinations in spite of his back condition.

On or about December 7, 1978, Robson was again examined by a company physician, this time by Dr. Tripp, who was new to the proving grounds. On the same day, Dr. Tripp issued his recommendations which concluded that Robson was to be removed from test driving because "[h]e does not meet the minimum requirements for classification as [a] driver." The evaluation form filed by Dr. Tripp listed the restriction as permanent. When he learned of Dr. Tripp's recommendation, Robson immediately contacted his supervisors, one of whom asked Dr. Tripp if he might make a further evaluation. Dr. Tripp said he would be glad to review any new evidence or documentation.

After Dr. Tripp's recommendations were issued, plaintiff was not permitted to do any test driving. He remained in the "test driving unit," however, and his salary and classification as a driver remained unchanged for approximately sixteen months. During that time he worked as a weather observer, in the mailroom, and as a receptionist-guard. On a number of occasions during that period, Mr. Robson spoke with his superiors at General Motors asking to be returned to test driving duties. One of those supervisors suggested that Robson get an outside opinion to serve as

evidence to rebut Dr. Tripp's evaluation. In January, 1980, plaintiff obtained an evaluation from William Smith, head of orthopaedic surgery at the University of Michigan. The report dated January 24, 1980, indicated that "[t]here should be no reason why the curve [scoliosis] should affect his [plaintiff's] employability. . . . The question of whether he is anymore at risk with the scoliosis than any other individual is not true [sic]."

Plaintiff submitted this evaluation to Dr. Tripp, who considered the new evidence and reevaluated his own recommendations. His new report, dated March 19, 1980, concluded that plaintiff "[d]oes not meet performance standards for driver at this time." Dr. Tripp issued another "Medical Notice of Ability to Return to Work" form the next month, April 17, 1980, which stated, "No test road driving."

On May 16, 1980, plaintiff's classification was changed and he was transferred to the security department. After the transfer, Robson made a number of unsuccessful verbal requests to be transferred back.

In 1981, Dr. Tripp left the proving grounds and was replaced by Dr. Charles Kenderick. Some time after Dr. Kenderick assumed his position, Mr. Robson again went to his supervisors, who advised him to go to the new doctor and seek medical authorization to return to the test driver position. Mr. Robson then went to Dr. Kenderick requesting an explanation for his removal from the test driver position. Dr. Kenderick explained that General Motors medical guidelines were the basis for the restrictions.

Later, on August 26, 1981, the new medical director issued another medical report stating, "No test driving."

On February 12, 1982, plaintiff was laid off from

his position in the security department. Had he remained a test driver, he would have had enough seniority to withstand layoff.

Plaintiff filed his complaint pursuant to the Handicappers' Civil Rights Act, in the Wayne Circuit Court on June 14, 1982. He sought reinstatement to the test driving position and back pay from the date of his termination. Defendant filed a motion for summary judgment, arguing that the complaint was filed outside the three-year statute of limitations.

The trial court granted defendant's motion, and the Court of Appeals affirmed, holding that Robson's cause of action accrued on December 7, 1978 (six months beyond the limitation period), the date he was initially removed from test driving.

### B. SUMNER v GOODYEAR TIRE & RUBBER COMPANY

Plaintiff, Daniel Sumner, a black man, was hired in 1971 by defendant Goodyear. In 1972, he came under the supervision of James Grace, a shift foreman. Plaintiff testified that Grace repeatedly verbally abused him, calling him "boy," "nigger," "cottonpicker," and other racially derogatory names. Plaintiff also alleged that Grace stood over him for long periods of time while he was working. While Grace denied engaging in such racial harassment, the testimony of other employees supported Sumner's version of the events. In addition, the union divisional chairman testified that Grace said of Sumner, "This is one nigger I am out to get if he doesn't straighten up."

Sumner also testified that on several occasions Grace attempted to prevent him from obtaining medical assistance when injured at work. This testimony was also supported. After one of these occasions, Grace, Sumner, a supervisor, and a

union official met in Grace's office. Sumner testi-
fied that at this meeting Grace pointed his finger
close to Sumner's face and shouted repeatedly,
"Say what you want to say, do what you want to
do," which Sumner took as an invitation to fight.
However, at that time no fight occurred.

Sumner repeatedly complained to union officials
who urged him to transfer to another building. He
did so, but testified that Grace from time to time
came to this other building to harass him and that
at one point Grace told him that he was going to
see to it that he lost his job.

After approximately a year of work in the new
building, Sumner successfully bid on a servicing
job. Unfortunately, Grace was the foreman under
whom Sumner would have had to work in this new
position. He therefore switched from the second to
the third shift. The third-shift supervisor was Har-
old Bohnett. Sumner testified that on his first
night on the new shift Bohnett said to him, "You
must be Mr. Grace's nigger," and that this initi-
ated a second period of harassment, only now with
two supervisors, Bohnett and Grace, involved.

Some time later, Sumner missed a day of work.
He testified that Bohnett threatened, "We have
got you now, boy," and "Let me see you work your
way out of this one, nigger."

Sumner testified that when he arrived at work
the next night Bohnett immediately approached
him, mumbled something derogatory, and began to
laugh at him. Sumner claims that this was the
straw which broke the camel's back. He followed
Bohnett into the office and struck him. Grace and
another company individual were also in the office.
Sumner struck them as well, though he claims he
only did so after they joined the altercation in
Bohnett's defense. It is not disputed that Sumner

threw the first punch and that the supervisory personnel required medical attention.

Sumner was given two consecutive two-day "cooling off" suspensions. On August 9, 1974, he was discharged from defendant's employ for attacking his supervisors.

Sumner filed his complaint with the Civil Rights Commission on November 7, 1974. Michigan's Fair Employment Practices Act, then in effect, required that a complaint of an alleged unlawful employment practice be filed within ninety days after the alleged act of discrimination. Sumner's complaint was filed exactly ninety days after his discharge and ninety-four days after the last alleged incident of harassment, i.e., Bohnett's comments just preceding the altercation.

Sumner's administrative complaint alleged that he was racially harassed and that he was discriminatorily discharged, since whites who had committed similarly violent acts had not been fired, and that the fight for which he had been fired had been provoked. His case was initially heard by a hearing referee. A Civil Rights Commission opinion followed, and the Ingham Circuit Court heard the case de novo.[2]

The referee found that the alleged harassment did occur, and he found that the Department of Civil Rights complaint had been timely filed. The finding of timeliness was based on his unexplained view that "the final act of discrimination, the discharge, occurred on August 9, 1974."

However, the referee rejected plaintiff's provoca-

[2] MCL 37.2606; MSA 3.548(606) reads in pertinent part:

(1) A complainant and a respondent shall have a right of appeal from a final order of the commission . . . before the circuit court for the county of Ingham. . . . An appeal before the circuit court shall be reviewed de novo.

tion argument as to the discharge stating that
"[w]rongs cannot be righted by physical assaults
on the perpetrators." He also rejected the argu-
ment that there had been disparate treatment in
the discharge.

The Civil Rights Commission rejected both of the
referee's recommendations. It examined the evi-
dence of disparate treatment in discipline and
found that Sumner's discharge was, in part, based
on unlawful considerations of race.

The commission, however, rejected Sumner's al-
legations of harassment as untimely, since the last
alleged incident of harassment took place two days
outside the limitation period. The commission did
not view the discharge as part of a continuing
violation along with the harassment. It held in-
stead that Sumner's case involved two separate
and distinct acts of racial discrimination, a timely
discharge claim, and an untimely harassment
charge.

The Ingham Circuit Court reversed both findings
of the commission. After examining the prior his-
tory of discipline following altercations, the circuit
court held that the firing did not constitute dispa-
rate treatment. At the same time, the circuit court
denied defendant's motion for summary judgment
on timeliness grounds. The court held that there
was a disputed issue of material fact, i.e., "whether
the racial harassment was part of a continuous
course of illegal conduct culminating in claimant's
discharge."

Turning to the ultimate decision on the merits,
the circuit court found

> that the acts of racial harassment and the act of
> discharge, although separate acts, were so closely
> related that they were a continuous course of
> conduct. The last act in this continuous course of

conduct occurred on August 9, 1974, which was 90 days prior to November 7, 1974.

The connection between the harassment and the discharge was grounded in the notion of provocation. The court's findings of fact stated in pertinent part:

8. That the altercation of August 5, 1974, was the result of the continuing abuse and harassment that Claimant had suffered from those two supervisors during the one and one-half years prior to and including said date. That the altercation was provoked by such abuse and harassment.

9. That the continuing racial abuse and harassment which precipitated the altercation, were a series of separate but related acts and were, therefore, a continuous course of conduct up to and including the time of Claimant's discharge.

10. That as a result of the altercation, Claimant was discharged on August 9, 1974.

The court awarded Sumner $13,500 in exemplary damages. Both parties appealed. The Court of Appeals held that the circuit court's judgment as to the discriminatory discharge allegation should not be overturned as Sumner had failed to present a prima facie case of disparate treatment regarding the discharge. However, the Court of Appeals reversed the circuit court's ruling on the timeliness of the harassment charge. While granting that the discharge and the prior acts of harassment may have been closely related, the Court noted that the timely act must be discriminatory and that the discharge was not, since plaintiff was discharged on legitimate grounds, i.e., that he had attacked his supervisors.

*C. KNIGHT v BLUE CROSS/BLUE SHIELD OF MICHIGAN*

Plaintiff, Carolyn Knight, began working as a

stenographer for Blue Cross in 1969. In 1973, she was assigned as a secretary to James McGuire, District Manager of the Blue Cross Ann Arbor offices. Plaintiff testified that during the first two months in her new position, McGuire frequently touched and patted her legs, kissed her, made sexually suggestive remarks, and proposed that Knight engage in sex with him. McGuire denied that any of these events occurred.

Plaintiff further testified that in late November, 1973, McGuire told her that on the following day there were to be meetings in Lansing which both of them would have to attend, and she should pack an overnight bag since they would stay over after the meeting. Knight said she would not spend the night, and McGuire would have to take her home.

After the meetings, at approximately 10:00 P.M., McGuire suggested that he and Knight get a motel room. She refused, and they argued for some time. Eventually, they began driving, but while still in Lansing, McGuire announced that he was low on gas, and they would have to stop at a gas station. According to Knight, she spotted a station before they entered the expressway, but McGuire refused to stop, saying that he did not like that kind of gas. McGuire testified that due to the then-existent gas crisis, he believed his best plan would be to find a station on the expressway.

McGuire left the expressway near Howell and informed Knight that they were almost out of gas, and they would have to stay in a motel. Knight testified that she suggested some alternatives, such as calling AAA or the state police, but McGuire refused. He went into the Holiday Inn office, and upon returning, he told Knight that there was only one room available. A Holiday Inn clerk testified that, in fact, on that evening there were twenty vacant rooms. After arguing with McGuire

and unsuccessfully attempting to secure an alternative ride home, Knight accompanied him to the room. There, according to Knight, McGuire went to Knight's bed and began kissing her. She pushed him away, and he returned to his own bed. McGuire claimed that he misunderstood the desk clerk, and that he made no attempts to kiss or have sex with Knight in the motel.

Knight claims that immediately after this event, McGuire became generally critical of her and made rude and hostile remarks to her at work. She testified that in January, 1974, she asked a supervisor for the day off to attend a funeral and the supervisor agreed. On the day of the funeral, she called in and McGuire insisted that she return to work.

Knight also claims she was suspended in March, 1974, after she refused to use her own car to run a business errand. She claims that she had never before been asked to use her own car for business purposes. McGuire refused to let her use his car or call a cab. She says McGuire told her she was insubordinate and suspended her. McGuire testified that Knight claimed she no longer wanted to be the office "gofer."

Knight protested the suspension to personnel. McGuire's supervisor, Yee, ruled that the suspension was proper. At the same time, he informed Knight that she had received the lowest possible rating on her performance review which had been prepared by McGuire. McGuire testified that this low rating was due to Knight's repeated absences and tardiness, her negative attitude towards people, her proclivity towards making personal calls, and her lack of maturity.

Knight appealed both the suspension and performance review to Yee's boss, Mr. Carron, who did not testify at trial. She claims she informed Car-

ron of the alleged sexual harassment. Carron ruled
in Knight's favor and recommended that Knight
be granted a transfer outside Ann Arbor. After
initial resistance, McGuire made the changes on
the evaluation sheet.

Knight's attempt to transfer proved unsuccess-
ful. According to the personnel officer, this was
due to her high absenteeism and critical attitude.
However, she did have a number of conversations
with individuals in the personnel department, and
she claims she informed one of them about the
sexual harassment.

In May, 1974, McGuire initially refused to ap-
prove Knight's vacation request and later threat-
ened to rescind his approval. In June, 1974, he
refused to give Knight a personal day off which
she requested because her mother was undergoing
surgery.

Twice in 1974 McGuire reclassified paid sick
days taken by Knight as unpaid absences. Both
times the Blue Cross Health Clinic reversed this
action. In December of that year, Knight broke
her hand, and she testified that McGuire threat-
ened to, but did not, suspend her for insubordina-
tion since she could not type.

Shortly thereafter, Knight was assigned to a
special task force which required that she work for
three months in the Detroit office. She was evalu-
ated there by her supervisor as an outstanding
employee.

McGuire testified that upon Knight's return in
June, 1975, he learned that Knight had been
divulging confidential information, such as salary
data, to unauthorized personnel and had shown a
confidential letter to a competitor. He therefore
removed highly confidential material from her
duties. He also testified that throughout 1974 and
1975 Knight engaged in a number of inappropriate

activities such as undermining his authority and making rude and uninvited comments.

In June, 1975, Mary Lynn, the Office Manager, assigned Knight to work in a new program making telephone calls to small business owners describing Blue Cross group benefits and determining if they would be interested in possibly obtaining such coverage. This job had previously been done by another employee who was an "extra" and who, according to Knight, could have continued to do it. Knight claims that she explained to Lynn that she had experience with telephone solicitation and that it made her physically ill. Lynn informed McGuire, who then ordered Knight to make the calls.

After a week or two during which time Knight testified she was vomiting at work due to her being upset over having to do the phone work she told McGuire that the job was making her ill. He again insisted she do the job, and she again refused. McGuire then suspended Knight for three days. Knight appealed this suspension and presented a brief note from her doctor substantiating her claim of illness.

After the suspension she was again assigned to the telephone solicitation project. She again became ill and said she could not continue. McGuire again suspended her. Knight appealed this suspension to Robert Reverly, a Blue Cross vice-president, and claims she told him of her physical problem, as well as the allegations concerning the motel incident, McGuire's sexual advances, and the subsequent harassment. Reverly set aside Knight's suspension until the matter was resolved. Knight claims that Reverly did not investigate her claims of sexual harassment. Knight remained at her job for a few more weeks, the last of which fell within the timeliness period.

On August 19, 1975, the personnel department informed Knight, through McGuire, that since she was physically unable to perform her duties, she would be fired unless she resigned. That same day she resigned, indicating that her resignation was due to sex discrimination.

A Blue Cross policy provided for internal appeals of discharges and forced resignations so long as they are raised within ten working days. On the final day of this period, Knight appealed and without further explanation, raised the issue of "harassment." A week later she submitted a letter detailing the history of alleged sexual harassment and resulting retaliation. The appeals committee deemed this information unreliable since it was submitted late and sounded like a last-ditch attempt to avoid termination. No investigation of Knight's charges was made. Attending the meetings of the appeals board was one of the personnel officials whom Knight claimed she had earlier complained to about the harassment. Also attending was Mr. Yee. During this period of time, Ms. Little also spoke with Mr. Carron. However, Ms. Little testified that none of these individuals mentioned Knight's earlier complaints. Ms. Little testified that had she known there was a charge of sex harassment she would have investigated it and her ultimate decision may have been different. Plaintiff's internal appeal was denied and her termination was upheld.

Plaintiff filed suit in Wayne Circuit Court on August 11, 1978, alleging, inter alia, that the alleged sexual advances made by McGuire, his alleged retaliation against her for refusal to engage in sex with him, and her forced resignation consti-

tuted discrimination in violation of the Michigan Civil Rights Act.[3]

The suit was tried before a jury. The judge instructed the jury that they should find for plaintiff if they found that

1. McGuire had made unwanted sexual advances toward Knight,

2. Knight rejected these unwanted advances,

3. Knight's rejection of McGuire's advances was a significant influencing factor in her termination, and,

4. Knight gave notice of her claims of sexual harassment to defendant, Blue Cross.

In addition, the jury was instructed that if Blue Cross had failed to adequately investigate plaintiff's complaints of the harassment, "it may be implied that the employer tacitly approved of the conduct which is the subject of the complaint."

The jury, using a special verdict form, found that McGuire made unwanted sexual advances toward Knight which she rejected. However, the jury found that Knight's rejection of the unwanted sexual advances was not a significant influencing factor in her termination, and judgment was entered for defendant.

Plaintiff appealed to the Court of Appeals and raised four issues: first, that the trial judge erred in not permitting the jury to consider damages for the harassment occurring prior to the limitation period, since the jury could have found it was part of a continuing violation; second, that the trial judge erred in refusing to instruct regarding defendant's liability for failure to investigate the charges of sexual harassment which plaintiff

---

[3] MCL 37.2101 *et seq.;* MSA 3.548(101) *et seq.*

claims she made; third, that plaintiff was entitled to a directed verdict, since defendant never articulated a legitimate nondiscriminatory reason for her discharge; and fourth, that the verdict was against the great weight of the evidence.

The Court of Appeals affirmed the judgment. It held that defendant had rebutted plaintiff's prima facie case by advancing a legitimate reason for her termination, and therefore a directed verdict was not in order. Similarly, the Court found that there was sufficient evidence to support the jury's verdict. The Court of Appeals also held that while the duty to investigate instruction was "not given in the exact language requested . . . , [w]hen . . . viewed as a whole . . . it is evident that the jury was adequately and properly instructed on the duty to investigate." Unpublished opinion per curiam of the Court of Appeals, decided July 23, 1984 (Docket No. 65666), p 22. As to the instructions limiting plaintiff's damages to the limitation period, the Court held that, since the jury found that there was no cause of action, the issue of damages was moot.

Plaintiff raises the same issues before this Court, although she has abandoned the argument that the jury's finding was against the great weight of the evidence.

## II. THE DEVELOPMENT OF THE CONTINUING VIOLATIONS DOCTRINE

It has been said that "[t]he law relating to continuing violations is hopelessly confused . . . ." *Ferguson v E I duPont de Nemours & Co, Inc,* 560 F Supp 1172, 1189, n 37 (D Del, 1983). This Court has not, until now, had the opportunity to address this area of the law. We do so today in deciding these cases, in order to clarify the scope and

function of the continuing violation doctrine in Michigan and offer direction to bench and bar.

The doctrine was developed by the federal courts in the context of Title VII of the federal Civil Rights Act, and continues to play an important role in federal discrimination law. It is therefore appropriate that we, as we have done in the past in discrimination cases, turn to federal precedent for guidance in reaching our decision.[4]

Title VII[5] of the federal 1964 Civil Rights Act, like the Michigan Civil Rights Act, the Fair Employment Practices Act,[6] and the Handicappers' Civil Rights Act,[7] defines and bars unlawful discrimination practices. As originally passed, Title VII required that employees file their complaints with the Equal Employment Opportunity Commission within ninety days after they had been subjected to a discriminatory employment practice.

In the late 1960's, federal courts began to refuse to automatically dismiss cases where the complaint had not been filed in a timely fashion. These courts expressed concern with a number of factors which they felt militated against a strict application of the limitation requirement. First, Title VII is a remedial statute whose purpose is to root out discrimination and make injured parties whole. Second, employees are generally lay people, who do not know that they must act quickly or risk losing their cause of action. An employee may fear reprisal by the employer, or may refer the matter to a union, which may not take any action within the limitation period. Employees may also delay

---

[4] See *Northville Public Schools v Civil Rights Comm*, 118 Mich App 573; 325 NW2d 497 (1982); *Civil Rights Comm v Chrysler Corp*, 80 Mich App 368; 263 NW2d 376 (1977).

[5] 42 USC 2000e *et seq.*

[6] MCL 423.301 *et seq.;* MSA 17.458(1) *et seq.,* repealed by 1976 PA 453, MCL 37.2101 *et seq.;* MSA 3.548(101) *et seq.*

[7] MCL 37.1101 *et seq.;* MSA 3.550(101) *et seq.*

filing their complaints in the hope of internal resolution or simply to give the employer a second chance. Third, and most importantly, many discriminatory acts occur in such a manner that it is difficult to precisely define when they took place. One might say that they unfold rather than occur. As stated in *Elliott v Sperry Rand Corp,* 79 FRD 580, 584 (D Minn, 1978):

> In order to determine whether a charge is "timely," . . . the Court must determine when the alleged Title VII violation occurred. This has proved surprisingly difficult, for some employment practices cannot logically be viewed as discrete "incidents" occurring at a particular point in time . . . .

The federal courts avoided strict application of the ninety-day limit by developing what came to be known as the continuing violation doctrine.

In 1972, Congress extended the ninety-day EEOC filing period to 180 days. At the same time, Congress imposed a two-year limit on back-pay awards. This was an implicit endorsement of the continuing violation theory, as such a limit could only make sense if liability could be found for acts occurring outside the 180-day period. The theory was noted and explicitly endorsed by Congress in its explanation of the amendment:

> Existing case law which has determined that certain types of violations are continuing in nature, thereby measuring the running of the required time period from the last occurrence of the discrimination and not from the first occurrence is continued, and other interpretations of the courts maximizing the coverage of the law are not affected. [118 Cong Rec 4941 (1972) (report of Sen. Williams); see Cong Rec 7563, 7565 (1972) (reprint of House Conference Report).]

Federal courts throughout the late 1960's and early 1970's invoked the doctrine without clear-cut reasons or guidelines. The United States Supreme Court responded to this arbitrary use of the theory in a series of three cases.

In the first of these cases, *United Air Lines, Inc v Evans*, 431 US 553; 97 S Ct 1885; 52 L Ed 2d 571 (1977), a stewardess had, in 1968, been forced to resign under then-existing company rules which required stewardesses, but not male employees, to resign when married. In 1972, after the discriminatory rule had been eliminated, plaintiff was rehired. However, in light of another company rule which stated that after a break in employment, employees returning to work would not be credited with any seniority from the earlier tenure, plaintiff could not get credit for the years she had worked prior to her forced resignation. Plaintiff could not bring an action solely on the basis of the 1968 action since it was barred by the statute of limitations. She therefore alleged that the 1972 denial of seniority constituted the most recent part of a continuing violation which was initiated in 1968. The Fifth Circuit Court held for the plaintiff and reinstated her claim.

The United States Supreme Court reversed. It held that plaintiff merely alleged the perpetuation of effects of prior discrimination. What is necessary, the Court stated, is a *"present violation,"* i.e., a discriminatory act within the limitation period. The refusal to grant seniority did not constitute such a violation, because it was based on a "neutral" rule, i.e., one that would be applied to all parties equally. The Court did note, however, that untimely acts "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue . . . ." 431 US 558.

In the wake of *Evans,* the continuing violation doctrine was analyzed in terms of three subtheories: 1) a "policy of discrimination," 2) a "continuing course of conduct," and 3) the "present effects of past discrimination." See *Elliott v Sperry Rand, supra;* Schlei & Grossman, *Employment Discrimination Law,* pp 884-908; Carty, *The continuing violation theory of Title VII after* United Air Lines, Inc v Evans, 31 Hastings L J 929 (1980); Edinburgh, *Title VII and the continuing violation theory: A return to congressional intent,* 47 Fordham L R 894 (1979); Note, *Continuing violations of Title VII: A suggested approach,* 63 Minn L R 119 (1978).

The first subtheory involves allegations that an employer has engaged in a continuous policy of discrimination. In such a case, the plaintiff is alleging that "he is challenging not just discriminatory conduct which has affected him, but also, or alternatively, the underlying employment system which has harmed or which threatens to harm him and other members of his class." Schlei & Grossman, *supra,* p 901.

The second subtheory, the "continuing course of conduct" or "series of events" situation is relevant where an employee challenges a series of allegedly discriminatory acts which are sufficiently related so as to constitute a pattern, only one of which occurred within the limitation period.

The third subtheory, by all accounts, ceased to be actionable after *Evans.* That subtheory held that a continuing violation existed where a party suffered timely effects or injury from a past untimely act of discrimination.[8]

---

[8] It should be noted that although the principle of equitable tolling of a statute of limitations is conceptually related to that of the continuing violation, they are different, and should not be confused. Equitable tolling does not require that there be any discriminatory

In cases involving a continuous course of conduct, where only one event was timely, some parties have responded to *Evans* by complaining of only the timely violation, calling it an "independent violation." Plaintiff in *Robson* makes such an argument as an alternative to his policy subtheory version of the continuing violations doctrine. However, *Evans* is relevant to this alternative analysis as well. Even where no continuing violation is claimed, if the alleged independent act was in fact only an effect of a prior discriminatory act, there is no cause of action. An "independent violation" is no different in its make-up than an ordinary timely violation. It is termed "independent" only in response to an argument that the alleged violation is merely an inactionable effect of an untimely violation. A true independent violation would, of course, trigger the running of a new period of limitation for that violation and that one only. See n 11.

*Evans* was followed by two other United States Supreme Court rulings which appear to have often been inappropriately applied in cases involving continuing violations.

In *Delaware State College v Ricks,* 449 US 250; 101 S Ct 498; 66 L Ed 2d 431 (1980), plaintiff, a Liberian-national professor, was informed, in March 1974, that he had been denied tenure. He immediately filed an internal grievance. During the pendency of his grievance, plaintiff was, pursuant to college policy, offered a nonrenewable "terminal" one-year contract which would expire June 30, 1975. He signed the contract. On September 12, 1974, plaintiff was notified that his grievance had

acts beyond a given isolated incident. It is properly applied where the employee, by the actions of the employer or due to other circumstances, is denied notice of the discriminatory act or is, in some other way, prevented from making a timely filing.

been denied. Plaintiff filed his Title VII grievance with the EEOC on April 28, 1975. He filed his § 1981 suit on September 9, 1977. Title VII and § 1981 have 180-day and three-year statutes of limitations, respectively.

The United States Supreme Court held that the limitation periods began to run from the time plaintiff was notified that he had been denied tenure. The Court rejected the notion that the rejection of plaintiff's grievance or his actual termination would serve as more appropriate events to initiate the running of the limitation periods. Instead, it held that the discriminatory act, if any, occurred at the time plaintiff was told he had been denied tenure. It held that the "termination of employment at Delaware State is a delayed, but inevitable, consequence of the denial of tenure" and that "[m]ere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination." *Id.* at 257. The Court focused on what it termed "the time of the discriminatory acts," rather than on "the time at which the consequences of the acts became most painful." *Id.* at 258.

*Evans* had gone no farther than to say that where an action is not in and of itself discriminatory, i.e., it has a discriminatory effect *only* because of a prior discriminatory act, it cannot sustain a cause of action. *Ricks* confirms that by pointing out that

> [i]f Ricks intended to complain of a discriminatory discharge, he should have identified the alleged discriminatory acts that continued until, or occurred at the time of, the actual termination of his employment. But the complaint alleges no such facts.
>
> . . . In order for the limitations periods to commence with the date of discharge, Ricks would

have had to allege and prove that the manner in which his employment was terminated differed discriminatorily from the manner in which the College terminated other professors who also had been denied tenure. But no suggestion has been made that Ricks was treated differently from other unsuccessful tenure aspirants. [*Id.*]

This, like *Evans,* indicates that, if there is a timely discriminatory act, the cause of action may be heard.

However, *Ricks* also created a great deal of confusion because the Court did not define exactly how it construed the denial of tenure. At some points in the opinion, the denial of tenure is seen, like the 1968 discharge in *Evans,* as an *act* of discrimination, and the termination is seen as the natural consequence:

In this case the only alleged discriminatory act is the denial of tenure . . . with the termination of employment not occurring until a later date. [449 US 258, n 9.]

Such a reading would make *Ricks* the same case as *Evans.*

However, the Court also refused to hold that the action did not accrue until Ricks' grievance was denied. That refusal could be seen as holding that once a party has been informed of an allegedly discriminatory decision (at least one involving termination), the action accrues even though the decision has not yet had any tangible effect upon the employee. That goes far beyond *Evans.* In *Evans,* the past discriminatory act was completely unrelated in its purpose to the present effect. Indeed, *Evans* rested on the fact that the intervening act, i.e., the seniority rules, were completely neutral. This latter reading of *Ricks* would instead

hold that even where there is no intervening element and the act (i.e., the decision to terminate) and the effect (termination) are intrinsically related, the statute begins to run at the time the employee is notified of the act.

The dissent in *Ricks* addressed the problems created by this early accrual date. First, it creates a difficult line-drawing problem for the courts, as they must determine when notice has been given. Second, it encourages litigation, rather than internal resolution. Third, the lack of a bright line will confuse wronged individuals and limit the remedial value of Title VII. 449 US 266.

Justice Stevens' dissent pointed out:

> The most sensible rule would provide that the date of discharge establishes the time when a cause of action accrues and the statute of limitations begins to run. Prior to that date, the allegedly wrongful act is subject to change; more importantly, the effective discharge date is the date which can normally be identified with the least difficulty or dispute.
>      . . . Both the interest in harmonious working relations during the terminal period of the employment relationship, and the interest in certainty . . . support this result. [*Id.* at 265.]

The question therefore remained open as to whether *Ricks* was merely an affirmation of the *Evans* "present violation" requirement and was to be applied only to situations involving separate injuries, or if it was instead pushing back in time the effective date of the occurrence of a single violation.

The last of the three United States Supreme Court cases, *Chardon v Fernandez,* 454 US 6; 102 S Ct 28; 70 L Ed 2d 6 (1981), resolved that question in favor of this latter, more expansive interpreta-

tion. In this case, nontenured administrators in the Puerto Rico Department of Education were notified by letter on dates prior to June 18, 1977, that their appointments would be terminated sometime between June 30, and August 8, 1977. Suit was filed on June 19, 1978, under 42 USC 1983. The district court held that the one-year-limitation period ran from the date of the letter and that suit was therefore untimely. The First Circuit Court of Appeals reversed, measuring the limitations period from the date of discharge. The United States Supreme Court reversed, holding that "the proper focus is on the time of the discriminatory act" (454 US 8) and that the discriminatory act was the *decision* to terminate. Therefore, once notice of this decision was received, the action accrued.

*Ricks* and *Chardon* bar the transforming of a single discriminatory act into a continuing one. We do not read them as constituting a substantial limitation of the continuing violations doctrine as defined in *Evans.*

We note nevertheless that the early accrual date mandated by *Ricks* and *Chardon* may conflict with the principle, well-established in Michigan law, that a cause of action does not accrue until an injury has occurred. We leave further exploration of this possible conflict to another date as it is *Evans,* rather than *Ricks* or *Chardon,* which defines the analysis relevant to the instant cases.

### III. ANALYSIS

#### A. *ROBSON v GENERAL MOTORS*

Plaintiff alleges that from the time he was removed from his position as a test driver until the date of his termination he was continually subjected to a policy of handicap discrimination. The

relevant policy was explicitly defined by the General Motors medical guidelines for test drivers. Unlike the situation in *Evans,* where there were two policies, one discriminatory and the other neutral, plaintiff here claims he was the timely victim of one discriminatory policy. Plaintiff claims that this single policy continually prevented him from working as a test driver.

Defendant argues that once a discriminatory policy is initially applied to an employee, that employee has notice of the policy, and that any future or continuing application of that policy is merely an "effect." We reject such a view.

In post-*Evans* cases, the federal courts have been nearly unanimous in holding that

> [a] continuously maintained illegal employment policy may be the subject of a valid complaint until a specified number of days after the *last occurrence* of an instance of that policy. [*Acha v Beame,* 570 F2d 57, 65 (CA 2, 1978). Emphasis in the original.]

In *Williams v Owens-Illinois, Inc,* 665 F2d 918, 924 (CA 9, 1982), the Ninth Circuit Court of Appeals determined that

> the relevant strain of continuing violation doctrine is that a systematic policy of discrimination is actionable even if some or all of the events evidencing its inception occurred prior to the limitations period. . . . The reason is that the continuing system of discrimination operates against the employee and violates his or her rights up to a point in time that falls within the applicable limitations period. Such continuing violations are most likely to occur in the matter of placements or promotions. A minority employee, who is not promoted in 1973, for example, and is subject to a continuing policy against promotion of minorities,

may then file a timely charge in 1976, because the policy against promoting him or her continued to violate the employee's rights up to the time the charge was filed.

Similarly, the court in *Reed v Lockheed Aircraft Corp,* 613 F2d 757 (CA 9, 1980), reinstated the plaintiff's cause of action where she claimed that the defendant had engaged in a continuous policy against training and promoting women. Her action had been dismissed, since she had never applied for a promotion, and therefore the plaintiff, in the district court's view, had not alleged a present violation. However, the company ordinarily approached on its own initiative those employees it wished to promote. In overruling the trial court, the court held that the policy constituted a present violation as required by *Evans.* The court opined that

"a challenge to systematic discrimination is always timely if brought by a present employee, for the existence of the system deters the employee from seeking his full employment rights or threatens to adversely affect him in the future." [613 F2d 761. Quoting *Elliott v Sperry Rand Corp, supra* at 586.]

Defendant has cited only one case, *Bronze Shields, Inc v New Jersey Dep't of Civil Service,* 667 F2d 1074 (CA 3, 1981), where it was held that a cause of action based upon a discriminatory policy accrued at the time the policy was formulated. This view was, however, rejected not only by the federal courts in policy cases generally, but specifically in four cases which involved precisely the same set of facts. See *Acha v Beame, supra; Guardians Ass'n of New York City Police Dep't, Inc v New York City Civil Service Comm,* 633 F2d 232 (CA 2, 1980); *Ass'n Against Discrimination in*

*Employment, Inc v City of Bridgeport,* 647 F2d 256 (CA 2, 1981); *Walls v Mississippi Dep't of Public Welfare,* 730 F2d 306 (CA 5, 1984).

We think the developing federal law on this subject, based on considerable experience applying analogous federal statutes, is a logical interpretation of those statutes. We also find this approach to be in keeping with the letter and spirit of our statutes as well.

Accordingly, we reject defendant's view because it is inconsistent with our understanding of the continuing violation theory. Discriminatory policies can constitute present violations of these statutes each moment they are in effect. While we agree with defendant that mere continuation of employment does not extend the life of a cause of action, the continued existence of a discriminatory policy does provide the basis for a continuing violation. We find that under the Handicappers' Civil Rights Act, an action is timely so long as it is filed within three years after the cessation of a deprivation proximately caused by such a policy and there is an application of that policy within the period of limitation.[9] Plaintiff may not, however, claim that any deprivations caused by a discriminatory policy continue beyond three years after termination of the employment relationship or the most recent refusal to hire.[10]

---

[9] The existence of a discriminatory policy alone is not necessarily sufficient grounds for an action. Causation must also be shown. For example, if plaintiff is eligible for promotion to only one position and during his tenure that position has never become available, he cannot argue that the policy has injured him.

[10] The logic of barring discriminatory policy subtheory continuing violations in these two settings is apparent. If the policy prevented an employee from receiving, for example, higher wages or a promotion, he cannot seek to receive those benefits once he is no longer an employee. A contrary result would allow a "perpetual violation." (This is not necessarily so where plaintiffs are laid off, since in such a case the employment relationship continues and a cause of action

Plaintiff in this case claims that he was removed from his position on the basis of a discriminatory policy. The fact that he sought to be retransferred on a number of occasions and that company physicians repeatedly found him unfit for test driving is evidence that this policy, its application, and the resultant deprivation continued well into the limitation period. The grant of summary judgment for defendant is therefore reversed.[11]

### B. SUMNER v GOODYEAR

Plaintiff raises two arguments. First, that his discharge was an example of disparate treatment, since white employees involved in altercations at Goodyear were not disciplined as harshly as blacks so involved. This is a question for the trier of fact. Findings of fact may not be set aside unless clearly erroneous. MCR 2.613(C). This standard is applicable to the findings de novo of a circuit court made on an appeal from a final order of a commission. *Dixon v Ford Motor Co,* 402 Mich 315, 317; 262

may lie for discriminatory recall. See *Cox v United States Gypsum Co,* 409 F2d 289 [CA 7, 1969].)

This refusal to allow continuing violations to become perpetual violations has long been the position of the federal courts. See *Roberts v North American Rockwell Corp,* 650 F2d 823 (CA 6, 1981); *Williams v Owens-Illinois, Inc,* 665 F2d 918 (CA 9, 1982); *Reed v Lockheed,* 613 F2d 757 (CA 9, 1980); *King v Seaboard C L R Co,* 538 F2d 581 (CA 4, 1976); *Olson v Rembrandt Printing Co,* 511 F2d 1228 (CA 8, 1975) (en banc).

[11] We also note that plaintiff maintains that the timely refusals to reinstate and the doctors' reaffirmations of his lack of qualifications in and of themselves constitute sufficient allegations of handicap discrimination act violations to provide for jurisdiction. Defendant is correct in pointing out that mere requests for reconsideration do not revive an untimely cause of action. However, if the manner in which plaintiff's requests for review were replied to was itself discriminatory, then that action may be challenged through court action. To hold otherwise would bar suits based on acts grossly discriminatory *in and of themselves,* simply because prior related acts were also discriminatory. See *Griffen v Big Spring Independent School Dist,* 706 F2d 645 (CA 5, 1983).

NW2d 666 (1978). Therefore, this Court may not substitute its own appraisal of the record, unless it is "left with the definite and firm conviction that a mistake has been committed." *Tuttle v Dep't of State Highways,* 397 Mich 44, 46; 243 NW2d 244 (1976). After reviewing the evidence of past altercations and disciplinary actions, we are not left with such a conviction and affirm the Court of Appeals ruling that the discharge did not constitute disparate treatment.

Plaintiff's second claim is that he was subject to a continuous course of discriminatory conduct, i.e., racial harassment culminating in his dismissal.

It is clear that the incidents of actual harassment were in the nature of a continuing violation. The Fifth Circuit Court of Appeals has aptly described the factors to be considered in determining whether a continuing course of discriminatory conduct exists:

> The first is subject matter. Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation? The second is frequency. Are the alleged acts recurring (*e.g.,* a biweekly paycheck) or more in the nature of an isolated work assignment or employment decision? The third factor, perhaps of most importance, is degree of permanence. Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate? [*Berry v LSU Bd of Supervisors,* 715 F2d 971, 981 (CA 5, 1983).]

The actions of Goodyear's agents fit precisely within this analysis. All the acts involve racial harassment and recurred with fairly high fre-

quency. The nature of harassment is that it ceases once the intent to harass ends. It does not provide notice of subsequent neutrally initiated injuries.

The mere existence of the continuing harassment is, however, insufficient if none of the relevant conduct occurred within the limitation period. *Evans, supra.* Similarly, the mere existence of some vague or undefined relationship between the timely and untimely acts is an insufficient basis upon which to find a continuing violation. Therefore, the central questions are whether Sumner's dismissal was a present violation and whether it was sufficiently connected to the harassment.

Defendant argues that while the actions of its agents may have constituted a discriminatory act, the firing was merely a neutral effect of plaintiff's violent behavior. While the decision to terminate was ultimately made by company officials not involved with the harassment, there was substantial evidence to indicate that the very purpose of the harassment was to provoke plaintiff into an action for which he could be terminated.[12] The

---

[12] In addition to the supervisors' general conduct and tone, a number of specific events were clear references to intentional provocation:

1. The union divisional chairman testified that in early 1972, Grace said to him, " 'This is one nigger I am out to get if he doesn't straighten up.' "

2. Sumner testified that while he was working in a department not supervised by Grace, Grace would come to that department and stand over him, and that one day Grace told Sumner that he was going to see to it that Sumner lost his job.

3. Sumner testified that at a meeting with a union committeeman and a supervisor, Grace loudly accused Sumner and shouted, " 'Say what you want to say. Do what you want to do,' " which Sumner interpreted as an invitation to fight.

4. Sumner testified that once, when he had missed a Saturday shift, Bohnett said to him, " 'We have got you now boy,' " and, " 'Let me see you work your way out of this one, nigger.' "

5. Sumner testified that immediately after Bohnett made the just

termination therefore may have been part of the plan or course of conduct and the discriminatory provocation a substantial factor in the resulting discharge. If this is in fact the case, the neutral mechanism of company rules and the decision to fire in this case would not have been invoked due to a fortuitous and unforeseen series of events, but instead because the supervisors may have consciously worked toward the opportunity to employ this neutral mechanism for a discriminatory purpose.[13] Under such unique circumstances, the

---

described remark, he replied, " 'I'm not going to hit you, because that's what you want me to do.' "

[13] Defendant cites *Glasgow v North Carolina Dep't of Transportation*, 522 F Supp 441 (ED NC, 1981), where an employee alleged that she was harassed over a period of time in retaliation for exercising her First Amendment rights. Plaintiff alleged that due to the harassment she was so upset that she had to take sick leave. She never returned from sick leave, which expired after three weeks, although her employer made repeated attempts to contact her. At the expiration of the sick leave, defendant wrote plaintiff informing her that she was terminated.

Plaintiff brought suit as to the alleged harassment and the discharge, claiming that both were punishments for exercising her rights to free speech. The only act by defendants falling within the three-year limitation period was the December 1 letter of discharge. The alleged protected speech and harassment were all untimely.

The court opined that

it is clear that the act of discharge, taken alone, must be found as a matter of law not to have been an unlawful act.
. . . At the expiration of her sick and annual leave, she was terminated as a matter of course since she did not report for work. There is no allegation or showing that this termination after a failure to report differed discriminatorily from the manner in which the [defendant] terminates other employees who fail to report. [522 F Supp 442-443.]

While *Glasgow* bears some resemblance to the instant case, it presents a fundamentally different situation in that the plaintiff in *Glasgow* did not allege or demonstrate that the harassment was intentionally designed to provoke her into taking prolonged sick leave.

mechanism is no longer neutral for the purposes of rendering timely the earlier harassment.[14]

We in no way condone plaintiff's violent actions. Indeed, plaintiff was convicted of aggravated assault and assault and battery for his unjustified behavior. Nevertheless, we think that to interpret the limitation period of the statute in a way that would allow racial provocation to be isolated from its possible ultimate intended purpose when the accomplishment of that purpose is timely would be to allow and encourage the worst kinds of blatant discrimination that the act was intended to eradicate. Provocation is not only connected with the intended result, but directed to it. Unlike more typical continuing violations, the alleged timely act, i.e., the discharge was not ordered by parties themselves possessing discriminatory intent. However, if plaintiff's supervisors intentionally provoked Sumner, and he was subsequently discharged for his response to the untimely harassment, the discharge is, for purposes of the continuing violation doctrine, a present violation, since, while not actionable for purposes of reinstatement, it carries the discriminatory intent into the timely period, thus allowing for jurisdiction over the unlawful harassment. We note that in *Evans* the initial discriminatory act was not taken with the *intention* of producing a future discriminatory effect.

We, therefore, determine that an intentionally provoked discharge, even if those making the determination were not improperly motivated, is so intrinsically connected to the harassment constituting the provocation, that it can serve to render

---

[14] This analysis does not contradict the finding that the termination was not discriminatory because it constituted disparate treatment.

timely the action for the harassment.[15] In light of the undeveloped state of employment discrimination law generally and the continuing violation doctrine specifically, it is not surprising that the finders of fact in this case did not focus on and determine whether the supervisors possessed the intent to provoke when they engaged in what all the factfinders viewed as a year and a half of provocative conduct. We, therefore, remand this case to the Civil Rights Commission for factfinding on the question of intentional provocation.

[15] We note, for purposes of clarification, that once jurisdiction is attained through the continuing violations doctrine, the remedy should be designed to make the plaintiff whole for the entire injury he has suffered. This has been the view of the great majority of the federal courts. See, e.g., *Thompson v Sawyer,* 219 US App DC 393; 678 F2d 257 (1982); *McKenzie v Sawyer,* 221 US App DC 288, 298; 684 F2d 62 (1982) ("Once having shown discrimination continuing into the actionable period, . . . the plaintiffs may also recover for portions of the persistent process of illegal discrimination that antedated the limitations period"); *Tarvesian v Carr Div of TRW, Inc,* 407 F Supp 336, 339 (D Mass, 1976) ("If plaintiff can prove . . . an integrated pattern of discrimination, the defendants become liable for the whole of it"); *Berry v LSU Bd of Supervisors* at 979-980; *Ganguly v New York State Dep't of Mental Health Hygiene,* 511 F Supp 420 (SD NY, 1981); *Clark v Olinkraft,* 556 F2d 1219, 1223 (CA 5, 1977); *Guardians Ass'n of New York City Police Dep't v New York City Civil Service Comm, supra; Acha v. Beame, supra* at 65; *Roberts v North American Rockwell Corp,* 650 F2d 823, 828 (CA 6, 1981).

In addition, the language of Title VII permits the remedy to address untimely actions, since its two-year cap on back pay substantially exceeds its 180-day period of limitation. The fact that the relevant Michigan statute has no such cap is indicative of even broader available relief, not the limited relief defendant suggests. It is also worth noting that, while *Evans* held that a present violation is a requisite for a finding of a continuing violation, it did not place any limits on the scope of the remedy. Indeed, in the companion case to *Evans, Teamsters v United States,* 431 US 324; 97 S Ct 1843; 52 L Ed 2d 396 (1977), the United States Supreme Court fashioned a remedy which took into account that part of the relevant injury occurring prior to the limitation period. Finally, in light of the confusing history of this doctrine, it is best to avoid dividing it into jurisdictional and remedial elements. Such a division serves only to render the doctrine even more mercurial and interfere with its original purpose.

### C. KNIGHT v BLUE CROSS/BLUE SHIELD

Plaintiff raises three issues on appeal to this Court. First, whether the trial court should have permitted the jury to consider damages for the untimely harassment since the jury could have found it was part of a continuing violation. Second, that the trial judge erred in refusing to instruct on defendant's liability for failure to investigate the charges of sexual harassment which plaintiff claims she made. Third, that plaintiff was entitled to a directed verdict since defendant never articulated a legitimate nondiscriminatory reason for her discharge.

Plaintiff's argument as to the extent of recoverable damages has two elements: that there was a timely violation and that the continuing violation doctrine makes available damages for the entire course of the discriminatory conduct. We agree with plaintiff's view of the latter element as discussed *ante,* n 15. However, we find that plaintiff failed to demonstrate to the jury the existence of a timely or present violation and therefore there can be no finding of liability for the untimely discriminatory acts.

The jury found, on the basis of ample evidence, that plaintiff was the victim of repeated unwanted sexual advances. The behavior of her supervisor may have constituted a continuing violation. However, absent a present violation, the conduct is barred by the statute of limitations. Plaintiff's situation is not the same as in *Robson,* where there was an allegation of a continuing policy of discrimination that continued into the timely period, or as in *Sumner,* where there was substantial evidence that the pattern of provocation was directed toward a result which occurred within the limitation period.

Plaintiff concentrated her arguments that there

was a present violation on the one week before her termination which fell within the limitation period. It is true that the trial court did not instruct the jury that it could find liability if defendant committed retaliatory acts during that week. However, it was not requested to do so, and nowhere in the trial record is there an indication that plaintiff was subjected either to unwanted sexual advances or to acts in retaliation for her refusal to agree to such advances during this brief period. Therefore, there was no error in the result reached on this question.

In addition to her harassment claims, plaintiff here also raises as a separate cause of action the existence of a "hostile employment atmosphere" caused by McGuire's actions which continued into the actionable period. Such an employment atmosphere caused by sexual harassment is proscribed by the 1980 amendment of the Civil Rights Act. MCL 37.2103(h)(iii); MSA 3.548(103)(h)(iii). However, plaintiff's cause of action arose and her complaint was filed before the passage of this amendment, and it is therefore inapplicable to her case.

The only other timely action that could constitute the present violation is the discharge itself. While the plaintiff does not directly focus upon that event as the timely violation, placing it in perspective is helpful in our overall discussion of continuing violation law.

It may well have been that plaintiff's transfer to the telephone solicitation assignment was the result of McGuire's retaliatory efforts, in which case the transfer itself would be part of the continuing though untimely violation. The verdict of the jury, however, leaves us no alternative but to conclude that the discharge from that assignment was a neutral act, and therefore only the "present effect of past discrimination," as described in *Evans*,

*supra.*[16] Accordingly, it is not a present violation necessary to support a continuing violation.[17]

Finally, plaintiff claims that the trial judge erred in refusing to instruct that an employer's failure to investigate a charge of sexual harassment is in and of itself a civil rights violation. The statute is specific as to what constitutes a substantive violation, and failure to investigate is not so specified. Furthermore, this view would allow a plaintiff to state a cause of action against an employer and indeed win damages even where there has been no harassment. We reject this view as unwieldy and incorrect. A failure to investigate is not independently actionable. It has in the past been used only as a formula for derivative liability against an employer whose agents or employees have engaged in sexual harassment.[18]

Plaintiff here asserts that since the defendant company, as part of its defense, claims not to have known of McGuire's harassment and retaliation the jury may have relied on that fact when it

[16] See also *Glasgow v North Carolina Dep't of Transportation,* n 13 *supra.*

[17] We note that there is support for the proposition that "an employer cannot use an employee's diminished work performance as a legitimate basis for removal where the diminution is the direct result of the employer's discriminatory behavior." *Weiss v United States,* 595 F Supp 1050, 1057 (ED Va, 1984). See also *DeGrace v Rumsfeld,* 614 F2d 796 (CA 1, 1980); *Moffett v Gene B Glick Co, Inc,* 621 F Supp 244, 266 (ND Ind, 1985). Cf. *Dep't of Civil Rights ex rel Cornell v Edward W Sparrow Hosp Ass'n,* 423 Mich 548, 569-570; 377 NW2d 755 (1985); *Bourque v Powell Electrical Mfg Co,* 617 F2d 61, 67 (CA 5, 1980). However, such was not alleged in this case; nor was it factually supported.

[18] Requiring plaintiff to show that there was an inadequate investigation may indeed be too great a burden. In the recent case of *Meritor Savings Bank, FSB v Vinson,* 477 US —; 106 S Ct 2399; 91 L Ed 2d 49 (1986), the United States Supreme Court held that where an employee is harassed by a supervisor or any other agent of an employer, the employer is not necessarily shielded from liability even where it has an established grievance procedure and plaintiff fails to make use of it or to otherwise put the employer on notice of the alleged misconduct.

found no connection between the prohibited acts and the discharge. Indeed, such a conclusion by a factfinder could be erroneous in view of the responsibility of the employer for the results of its failure to investigate. Nonetheless, there is a difference between an instruction that a failure to investigate is itself a violation of the statute and an instruction that the employer, if it does not investigate, is presumed to have knowledge of sexual harassment by its agents or employees. The former was not a proper instruction and the latter was not as such requested. A less precise instruction going to the employer's approval rather than knowledge was given by the trial court. See *ante,* p 523.

Therefore, under the circumstances, the jury instructions were not inconsistent with the theories argued and the evidence presented. They also were not legally erroneous under the principles set forth in this opinion.

We thus affirm the finding that there was no cause of action. In doing so we observe that, according to the jury finding, had plaintiff filed her sexual harassment claim in a timely fashion she would have established a cause of action. However,

"the period allowed for instituting suit inevitably reflects a value judgment concerning the point at which the interests in favor of protecting valid claims are outweighed by the interests in prohibiting the prosecution of stale ones." [*Delaware State College v Ricks, supra* at 259-260. Quoting *Johnson v Ry Express Agency, Inc,* 421 US 454, 463-465; 95 S Ct 1716; 44 L Ed 2d 295 (1975).]

Since we have found that there is no cause of action, the denial of her motion for a directed verdict is also affirmed.

### IV. SUMMARY

In *Robson*, we conclude that the plaintiff adequately alleged a discriminatory policy, the application of which extended into the period of limitation, and that the occurrences within the period were themselves discriminatory. We reverse the judgment of the Court of Appeals and the grant of summary judgment and remand the case for further proceedings not inconsistent herewith.

In *Sumner*, we find that while the discharge, the only occurrence within the period of limitation, was ordered by parties not themselves possessing discriminatory intent, it renders the action for harassment timely if the harassment was engaged in for the purpose of causing the discharge. We reverse the decision of the Court of Appeals and remand the case to the Civil Rights Commission for further factfinding on the question of intentional provocation.

In *Knight*, we find no error in the jury instruction that there was no liability in the absence of a finding of discrimination within the period of limitation in the act of discharge. We affirm.

LEVIN, CAVANAGH, and ARCHER, JJ., concurred with BRICKLEY, J.

ARCHER, J. (*concurring*). While I agree and have signed the majority's opinion, I write separately to address issues raised by the dissent.

### FACTS

During his first year of employment at the Goodyear Tire & Rubber Company, Daniel Sumner had held several positions without any problems or complaints. In his second year, 1972, Mr. Sumner

began work as a general operator in the tire room under the supervision of James Grace, the shift foreman. James Grace verbally abused Mr. Sumner, calling him "nigger," "boy," "blackboy," "cottonpicker," and other racially derogatory names. These racial slurs were overheard by other Goodyear employees. A division chairman of the company testified that James Grace said, in referring to Mr. Sumner, "This is one nigger I am out to get if he doesn't straighten up." A union committeeman, who is white, testified that Grace referred to black employees as either a "good nigger" or a "bad nigger." A former black employee testified that Grace also addressed him in racially derogatory terms approximately "once a week." That same employee testified that Grace, in referring to Mr. Sumner and his hairstyle, said "what did he think he was doing, picking cotton?"

On one occasion, after Mr. Sumner had injured his shoulder at work, Grace followed him to the plant hospital. The nurse at the hospital testified that after Sumner had requested a gate pass to allow him to go home due to the injury Grace commanded the nurse "not to give [Sumner] a gate pass and he was not going out of the building." This same nurse testified that she gave Sumner the pass anyway. Later that day, Grace told Sumner, "Get your black ass in my office, boy" for a meeting with a union committeeman and a supervisor. At this meeting, Grace loudly accused Sumner and persistently pointed his finger at him. When Sumner attempted to speak, Grace pointed his finger close to Sumner's face and shouted repeatedly, "Say what you want to say, [d]o what you want to do," inviting him to fight. On another occasion, Sumner punctured his arm on a hook and went to the hospital. Grace followed him, told him there was nothing wrong with him, and to get

back down to work because Grace needed the tires. The following day, because of his injury, the doctor gave Sumner "light duty" work. When Mr. Sumner reported to Grace for light duty, Grace remarked to one of his supervisors, "Give that boy a bucket and some rags and let him clean down all the truck tire machines." As Sumner went to clean the tire machines, Grace stated, "That's the kind of job you need, boy."

These events and the name-calling distressed Mr. Sumner. His testimony revealed that, initially, he tried not to let it bother him because he had a family to support. Finally, in an attempt to get some relief, Sumner began to complain. On at least three occasions he reported the verbal abuse to union officers, one of whom told him nothing could be done without a witness and advised Sumner to transfer to another department. Sumner also complained several times to the divisional chairman, who followed through on the complaint solely by checking with Grace. Grace informed the chairman that Sumner had to be followed to see that he did the job. However, at trial, Grace testified that he never had a problem with the quality of Sumner's work. Although Grace, who considers himself a strict disciplinarian, testified Sumner had an attendance problem at work, he never gave Sumner a written warning regarding the problem.

Sumner followed the union committeeman's advice, and transferred to another department. Even at the new job, Grace monitored Sumner. He would come over to the new department on a weekly basis, watch Sumner work and make "smart" remarks, once threatening that he was going to see to it that Sumner lost his job.

About a year later, Sumner bid on a servicing job. Unbeknownst to Sumner, Grace was the foreman on that job. The problems began anew. Grace

intimidated Sumner by watching him all day, and continued to call him "boy." To avoid Grace, Sumner switched to another shift, under the supervision of Harold Bohnett. On the first night, Bohnett said to Sumner, "You must be Mr. Grace's nigger." From that point, Bohnett's behavior echoed that of Grace. Bohnett called Sumner "boy" and "pickaninny."

Some time later, Daniel Sumner missed a day of work. Bohnett threatened, "We have got you now, 'boy,' " and "Let me see you work your way out of this one 'nigger.' " At the end of his shift, Daniel Sumner went to the local union president. Sumner complained that Grace and Bohnett were bullying him, calling him "nigger" and "boy," and threatening that they would "get him now." The union president attempted to set up a meeting. But, due to the absence of the divisional chairman, the meeting never occurred.

That same day, Sumner complained to a Goodyear employee who was also the president of the NAACP. The employee advised Sumner to go to the Civil Rights Commission. Later that day, Sumner went to the Jackson office of the Department of Civil Rights and complained to the district executive for the preventative services division, who advised Sumner to first exhaust the grievance process. The district executive also investigated Sumner's complaint. He talked with other Goodyear employees and determined that Sumner had a valid complaint. He, however, could not approach the company informally before legal process.

The next night, August 5, 1974, Daniel Sumner came to work early. Bohnett approached Daniel Sumner, stuck a finger in his face, and began to laugh. Daniel Sumner finally lost his temper. He followed Bohnett into the office and initiated an

altercation with him, which also involved other supervisors.

After this altercation, Daniel Sumner was placed on a two-day "cooling off" period imposed pursuant to the collective bargaining agreement. Sumner was discharged from employment four days after the altercation, on August 9, 1974. The reason cited for discharge was his physical assault of two shift foremen. The termination letter states that Daniel Sumner had alleged harassment. However, there is no evidence that Goodyear ever investigated Sumner's allegations.

On November 7, 1974, ninety days from the date of his discharge from Goodyear, Daniel Sumner filed a complaint in the Jackson office of the Department of Civil Rights against Goodyear, alleging that he had been continuously harassed by his supervisors, that this caused him to strike them, resulting in his discharge, and that this discharge was racially motivated.

### THE CONTINUING VIOLATION

The Fair Employment Practices Act, MCL 423.301 *et seq.;* MSA 17.458(1) *et seq.,*[1] governs this situation. The act provided in relevant part:

> Any individual claiming to be aggrieved by an alleged unlawful employment practice may, by himself or his agent, make, sign and file with the board, within 90 days *after the alleged act of discrimination,* a verified complaint in writing . . . . [Emphasis added. MCL 423.307(b); MSA 17.458(7)(b).]

Mr. Sumner was discharged on August 9, 1974. His complaint was filed with the Department of

---

[1] Repealed March 31, 1977 by the Civil Rights Act, MCL 37.2101 *et seq.;* MSA 3.548(101) *et seq.*

Civil Rights on November 7, 1974—exactly ninety days after his discharge. The last illegal act was not the fight. The last illegal act was the discharge under the guise of the fight. As indicated by the facts, the racial harassment by supervisors Grace and Bohnett was part of a continuous course of conduct which was connected to the discharge. Thus, in my judgment, the racial harassment charge was timely. As stated by Judge Warren in the circuit court opinion:

> This Court has found as a matter of fact, that the acts of racial harassment and the act of discharge, although separate acts, were so closely related that they were a continuous course of conduct. The last act in this continuous course of conduct occurred on August 9, 1974, which was 90 days prior to November 7, 1974.
>
> Because this Court has found these acts to be a continuous course of conduct and because the last of these acts occurred within 90 days from the date the complaint was filed, this Court concludes that the complaint was timely filed with the Commission. In such cases, the statute of limitations does not begin to run until the violation complained of ceases.

Federal cases under Title VII of the Civil Rights Act of 1964, 42 USC 2000(e) are regarded by Michigan courts as highly persuasive guidance in the application of civil rights statutes.[2] The "continuing violations" doctrine, as pronounced in *United Air Lines, Inc v Evans*, 431 US 553; 97 S Ct 1885; 52 L Ed 2d 571 (1977), and adopted in *Delaware State College v Ricks*, 449 US 250; 101 S Ct 498; 66 L Ed 2d 431 (1980), *and Chardon v*

[2] *Jenkins v American Red Cross*, 141 Mich App 785, 793, n 2; 369 NW2d 223 (1985); *Northville Public Schools v Civil Rights Comm*, 118 Mich App 573, 576; 325 NW2d 497 (1982); *Civil Rights Comm v Chrysler Corp*, 80 Mich App 368, 375, n 4; 263 NW2d 376 (1977).

*Fernandez,* 454 US 6; 102 S Ct 28; 70 L Ed 2d 6 (1981), provides that where an ongoing pattern of independent acts of discrimination is alleged, with only one of the allegedly discriminatory acts occurring within the statute of limitations period, the entire cause of action, including the acts outside the limitations period, will be deemed timely filed. That is, if the filing is timely as to the last act of alleged discrimination, it is timely as to the prior acts which would otherwise be outside the limitations period. For a continuing violation to exist, it is only required that the timely claims be so closely connected to the previous time-barred claims that the continuing nature of the discrimination is apparent.

Under *Evans, supra,* a plaintiff must prove a series of continuous violations constituting an organized scheme leading to a "present violation." 431 US 558. Since, in the instant case, the prior acts of racial harassment provoked the altercation, which culminated in Sumner's discharge, the whole sequence of events was a continuous course of illegal conduct. The illegality of this conduct was heightened by evidence which indicated that over a ten-year period black workers involved in on-the-job altercations at Goodyear were discharged where their white counterparts were not.[3]

## CONCLUSION

The purpose of the Fair Employment Practices Act, MCL 423.301 *et seq.;* MSA 17.458(1) *et seq.,* was, in pertinent part,

[3] A study of Goodyear's past disciplinary action imposed on white and black workers involved in on-the-job altercations over a ten-year period established that no white employee had ever been discharged for fighting the first time. Whereas, *all* black employees had been discharged for their first fight.

to promote and protect the welfare of the people of
this state by prevention and elimination of dis-
criminatory employment practices and policies
based upon race, color, religion, national origin,
sex, age, marital status, height, weight, certain
law enforcement records, or ancestry; . . . to pro-
vide for penalties and remedies; and for other
purposes.

It is my conclusion that this language was in-
tended to forestall the abusive and reprehensible
activity engaged in by supervisors Grace and Boh-
nett. This preamble language was also intended to
prohibit an employer's failure to halt such activity
once it has come to the employer's attention.

In this case, the harassment was prolonged over
a period of more than a year. Sumner had com-
plained to upper management and union officials
at the company, with no investigation by the
company. This failure to investigate could easily
be perceived as the company's systematic approval
of such harassment. Supervisors Grace and Boh-
nett's prior acts of racial harassment provoked the
altercation which culminated in Sumner's dis-
charge. The whole sequence of events constituted
an organized scheme leading to the discharge. The
discharge was the "present violation" under *Ev-
ans, supra.* An employer should not be allowed to
claim the last act, the discharge, is legitimate
when in fact, under the totality of the circum-
stances, the last act is utterly discriminatory.

Riley, J. (*concurring in part and dissenting in
part*). I agree with the majority's adoption of the
continuing violation doctrine. However, I disagree
with the majority's application of the doctrine in
*Sumner.* Thus, I dissent.

The majority finds as persuasive *United Air
Lines, Inc v Evans,* 431 US 553; 97 S Ct 1885; 52 L

Ed 2d 571 (1977). Under *Evans,* essential to the establishment of an actionable continuing violation is a present violation within the limitation period. The present violation must be a discriminatory act sufficiently connected to the prior acts by more than a "vague or undefined relationship." *Ante,* p 539. Without the showing of sufficient connection, the timely act (assuming it is discriminatory) is actionable only in and of itself. Any alleged prior discriminatory acts are barred. However, if sufficient connection is shown, the entire series of acts is actionable.

A discriminatory policy is analyzed in much the same manner. Plaintiff must allege a discriminatory policy, applied at some point within the limitation period, which caused a deprivation. *Ante,* pp 536-537.

In *Robson,* plaintiff alleged that he was the victim of a discriminatory policy which caused him to lose his job as a test driver and, subsequently, be laid off. Plaintiff made numerous attempts within the limitation period to regain his position, but each attempt was rebuffed, allegedly due to the policy. Thus, plaintiff sufficiently plead a discriminatory policy, applied within the limitation period. Therefore, I agree with the majority's reversal of the trial court's grant of summary judgment.

Furthermore, I agree with the majority's disposition in *Knight.* Plaintiff's discharge was the only act occurring within the limitation period. However, the jury found that plaintiff's termination was not significantly influenced by her rejection of her supervisor's sexual advances. Thus, plaintiff could not establish a present violation, without which there was no continuing violation. Therefore, the decision of the Court of Appeals must be affirmed.

In *Sumner,* as in *Knight,* the only act occurring within the limitation period was plaintiff's termination. Also, as in *Knight,* the discharge was found to be nondiscriminatory.[1] However, at this point, the majority's reasoning in *Knight* and *Sumner* begins to diverge.

In his complaint to the Civil Rights Commission, and in his appeal to the Ingham Circuit Court, Mr. Sumner alleged that his discharge was racially discriminatory. He presented data which he claimed tended to show that white employees were not discharged for this type of altercation, whereas black employees were. Although this was adequate to state a claim under a continuing violation theory, the circuit court rejected this contention as a matter of fact on review.

Mr. Sumner's allegation that the discharge itself was discriminatory is, in part, an implicit recognition of a basic requirement of the continuing violation theory, i.e., in order to maintain a cause of action, at least one of the discriminatory acts must be within the applicable period of limitation. The circuit court, in deciding the facts of this case, rejected this allegation, and its findings should not be overturned unless clearly erroneous. The decision to discharge Mr. Sumner has been found to be a neutral determination and, thus, no act of discrimination has been found to be within the ninety days required for a claim under the Fair Employment Practices Act.[2]

---

[1] The hearing referee made a specific finding that plaintiff's discharge was not race-related. The Civil Rights Commission did not follow the referee's recommendation, instead finding the termination to be discriminatory. However, after a review of the record de novo, the circuit court reversed the CRC finding of discriminatory termination. The court found plaintiff's discharge to be for a legitimate nondiscriminatory reason—his attack on his supervisors. The Court of Appeals affirmed that finding, as does the majority here.

[2] I would note that this is not a case where an employer took into

In order to link the nondiscriminatory termination with the earlier discriminatory acts, the majority is willing to impute, to the decision to discharge plaintiff, the discriminatory purpose of plaintiff's supervisors. The majority states:

> While the decision to terminate was ultimately made by company officials not involved with the harassment, there was substantial evidence to indicate that the very purpose of the harassment was to provoke plaintiff into an action for which he could be terminated. The termination therefore may have been part of the plan or course of conduct and the discriminatory provocation a substantial factor in the resulting discharge. If this is in fact the case, the neutral mechanism of company rules and the decision to fire in this case would not have been invoked due to a fortuitous and unforeseen series of events, but instead because the supervisors may have consciously worked toward the opportunity to employ this neutral mechanism for a discriminatory purpose. . . .
>
> . . . [W]e think that to interpret the limitation period of the statute in a way that would allow racial provocation to be isolated from its possible ultimate intended purpose when the accomplishment of that purpose is timely would be to allow and encourage the worst kinds of blatant discrimination that the act was intended to eradicate. Provocation is not only connected with the intended result, but directed to it. Unlike more typical continuing violations, the alleged timely act, i.e., the discharge was not ordered by parties themselves possessing discriminatory intent. However, if plaintiff's supervisors intentionally provoked Sumner, and he was subsequently discharged for his response to the untimely harassment, the discharge is, for purposes of the continu-

account subjective and allegedly false evaluations of the employee in reaching its "neutral" discharge decision. See, e.g., *Stoller v Marsh,* 221 US App DC 22; 682 F2d 971 (1982), cert den 460 US 1037 (1983).

ing violation doctrine, a present violation, since, while not actionable for purposes of reinstatement, it carries the discriminatory intent into the timely period, thus allowing for jurisdiction over the unlawful harassment. [*Ante,* pp 539-541.]

The importance of the purpose of the discrimination is illustrated by the fact that the majority distinguishes this case from *Glasgow v North Carolina Dep't of Transportation,* 522 F Supp 441 (ED NC, 1981), stating:

> While *Glasgow* bears some resemblance to the instant case, it presents a fundamentally different situation in that the plaintiff in *Glasgow* did not allege or demonstrate that the harassment was intentionally designed to provoke her into taking prolonged sick leave. [*Ante,* p 540, n 13.]

In *Glasgow,* the only act within the limitations period—the plaintiff's termination—was found to have been lawful. As such, there was no present violation, and plaintiff's action was thereby dismissed.

I disagree with the majority's reasoning in *Sumner* for two reasons. First, the majority declares that there was substantial evidence that the ultimate purpose of the harassment was plaintiff's termination. This purpose is essential to the majority's position as it links the discriminatory acts of harassment with the admittedly nondiscriminatory termination. Without this link, the majority will be unable to find a present violation and, as such, a continuing violation argument fails. However, the purpose behind the discrimination is a question of fact. No factfinder below considered, determined, or made findings as to the ultimate purpose of the harassment. To remedy this deficiency, the majority remands this case to the Civil

Rights Commission for further factfinding on the question of plaintiff's supervisors' intent.

However, even if plaintiff can show intentional provocation upon remand, we would find no present violation and thus no continuing violation. There may be situations in which an admittedly neutral discharge is so tainted as a result of intentional provocation, by persons not involved in the decision to discharge, that the discriminatory purpose must be imputed to the decision. Such a situation could involve a circumstance whereby the plaintiff has no control over the events leading to, or reasons for, the decision to discharge. An, example of this would be a supervisor discriminatorily transferring an employee to a position for which the supervisor knows the employee is not qualified, with the intent that the employee will ultimately be discharged for incompetence. The employee has no control over the transfer and thus is not to blame for any inability to perform in the new position. As such, the termination is not precipitated by any actions of the employee, but by the supervisor's discriminatory transfer.

Here, that is not the case. Plaintiff was discharged because he attacked his supervisors. Thus, plaintiff's own actions formed the basis of the decision to discharge him. His attack on his supervisors destroyed any link between the harassment and the discharge. There is no dispute that an employer may rightfully discharge an employee who attacks a supervisor. See *Otis v Inland Container Corp,* 25 FEP Cases 1280 (ND Ill, 1981). Thus, since plaintiff brought about the incident which precipitated his discharge, and the discharge was justified and not discriminatory, the intention of plaintiff's supervisors should not be imputed to the decision to discharge plaintiff.

Additionally, while the trial court found as a

matter of fact that the harassment provoked plaintiff into the attack, words alone may never justifiably incite an assault. See *Gungrich v Anderson,* 189 Mich 144; 155 NW 379 (1915); *Goucher v Jamieson,* 124 Mich 21; 82 NW 663 (1900). As such, the fact that the harassment provoked the attack does not provide the necessary link between the harassment and the termination. Since there is no link between the harassment and the termination, there is no present violation, and, therefore, no continuing violation.

My second disagreement with the majority's reasoning is that *Sumner* is essentially the same case as *Knight.* In both cases, the only timely event was the discharge. While both plaintiffs apparently were victims of harassment, both of their discharges were found to be nondiscriminatory. In each case, the discharge was arguably related to the harassment by the plaintiffs' supervisors. However, in *Knight,* the majority accepts the finding that the termination was neutral, choosing not to impute a discriminatory purpose as it is willing to do in *Sumner.* I see no logical reason for reaching a different result in *Sumner* than in *Knight.* As such, I dissent from the majority opinion in *Sumner,* and would affirm the decision of the Court of Appeals.

BOYLE, J., concurred with RILEY, J.

WILLIAMS, C.J. (*concurring in part and dissenting in part*). While also in agreement with the majority's adoption of the continuing violation theory of employment discrimination, I write separately because the majority's result in *Knight* seems inconsistent when compared with those in *Sumner* and *Robson.* Consistent application of the continuing violation theory would allow all three plaintiffs in these consolidated cases to recover.

In my opinion, the disparity in application be-

tween *Sumner* and *Robson* on the one hand and *Knight* on the other hand occurs because *Knight* was decided by special verdict of the jury and in *Sumner* and *Robson* the trial court was the trier of fact. In fact, the majority states:

> The verdict of the jury, however, leaves us *no alternative* but to conclude that the discharge from that assignment was a neutral act, and therefore only the "present effect of past discrimination" . . . . [*Ante,* p 544. Emphasis added.]

The jury used a special verdict form on which the crucial instruction stated that the jury should find for the plaintiff if "Knight's rejection of McGuire's advances was a significant influencing factor in her termination . . . ." *Ante,* p 523. Compare this instruction to the trial court's finding in *Sumner* that

> the acts of racial harassment and the act of discharge, although separate acts, were so closely related that they were a continuous course of conduct,

and that

> the continuing racial abuse and harassment which precipitated the altercation, were a series of separate but related acts and were, therefore, a continuous course of conduct up to and including the time of Claimant's discharge.

This is not to say that Ms. Knight's allegations were the same as Mr. Sumner's, but that she should have had the benefit of a jury instruction more closely aligned to the continuing violation theory.

I would remand *Knight* to the trial court to fashion an instruction or instructions consistent with the continuing violation theory of employment discrimination.