# Order

**Michigan Supreme Court**
**Lansing, Michigan**

March 7, 2008

133170

Clifford W. Taylor,
Chief Justice

Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman,
Justices

CHATHAPURAM S. RAMANATHAN,
      Plaintiff-Appellee,

v

SC: 133170
COA: 266238
Wayne CC: 98-810999-NO

WAYNE STATE UNIVERSITY BOARD OF
GOVERNORS,
      Defendant-Appellant,
and

LEON CHESTANG,
      Defendant.

_____/

On December 5, 2007, the Court heard oral argument on the application for leave to appeal the January 4, 2007 judgment of the Court of Appeals. On order of the Court, the application is again considered. MCR 7.302(G)(1). In lieu of granting leave to appeal, we REVERSE in part the judgment of the Court of Appeals, and we REMAND this case to the Wayne Circuit Court for further proceedings consistent with this order. As the Court of Appeals correctly ruled, the plaintiff's sole actionable claim, by operation of the applicable statute of limitations, is the decision of the Provost of Wayne State University to deny the plaintiff's request for tenure. MCL 600.5805(1); *Garg v Macomb Co Community Mental Health Services,* 472 Mich 263 (2005), amended 473 Mich 1205 (2005). The plaintiff presented no evidence that the Provost harbored any national origin or racial animus toward the plaintiff in reaching her tenure decision. *Dep't of Civil Rights ex rel Burnside v Fashion Bug of Detroit,* 473 Mich 863 (2005). The plaintiff cannot show any relevant connection between the identified comments of the Dean of the School of Social Work in 1993 and the Provost's tenure decision in 1995. *Sniecinski v Blue Cross & Blue Shield of Michigan,* 469 Mich 124 (2003). The plaintiff has not presented a genuine issue of material fact to sustain his claim of racial or national origin discrimination in violation of the Civil Rights Act, MCL 37.2101 *et seq.* On remand, the circuit court shall only proceed on the plaintiff's claim that the Provost, by denying tenure to the plaintiff, unlawfully retaliated against the plaintiff for the exercise of his rights under the Civil Rights Act.

CAVANAGH, WEAVER, and KELLY, JJ., would affirm the judgment of the Court of Appeals in all respects.

MARKMAN, J., dissents and states as follows:

I respectfully dissent. Plaintiff alleges that the dean of the university where he taught retaliated against him for filing a racial discrimination complaint with the university, resulting in the denial of his tenure application. In my judgment, plaintiff has failed to demonstrate the requisite causal connection between his complaint and the university's denial of tenure, because plaintiff has not shown that the dean harbored any retaliatory animus toward plaintiff. Moreover, plaintiff has failed to demonstrate that any alleged retaliatory motive on the part of a dean of the university should be imputed to the ultimate decision-maker, the university provost. For these reasons, I would reverse the judgment of the Court of Appeals and order summary disposition for defendant university.

## I. Facts and Procedural History

Plaintiff, who is of Asian-Indian descent, was hired in 1992 to teach at Wayne State University's School of Social Work. In the spring of 1993, plaintiff's work was favorably reviewed by the dean of the School of Social Work, Leon Chestang, who gave plaintiff a "1" rating, the highest rating possible. In October 1993, plaintiff met with the dean and expressed concerns that another professor had made discriminatory remarks to plaintiff regarding plaintiff's race. Plaintiff then made an informal complaint to the university's Equal Opportunity Office (EOO) regarding the alleged discrimination.

Plaintiff alleges that after this informal complaint was filed, the dean's attitude toward him dramatically worsened. At a faculty meeting in the fall of 1993, the dean compared what he viewed as an outdated concept of social work to the sitar, an Indian musical instrument that the dean considered to be equally outdated. In December 1993, the dean stated in response to criticisms directed at him at a different faculty meeting, "I don't mind being the sacrificial lamb, I just hope I'm not curried."

In December 1993, the dean renewed plaintiff's contract; the initial renewal was for six months. Several professors testified that this six-month period was unusually short and in violation of a union contract with the university. In April 1994, the contract was renewed for one year. In May 1994, plaintiff filed a formal complaint with the EOO, again alleging racial discrimination, as well as retaliation by the dean in response to plaintiff's informal complaint. In September 1994, the EOO concluded that no evidence of discrimination or retaliation existed.

On October 31, 1994, plaintiff applied for tenure. The dean recommended that it be denied. The School of Social Work Promotion and Tenure Committee recommended that the application be granted. The University Promotion and Tenure Committee recommended that it be denied. The university also received nine external review letters: six of these reviewers recommended in favor of granting tenure, two of these reviewers recommended against granting tenure, and one of the reviewers was neutral. The ultimate decision regarding plaintiff's tenure application was made by the university provost. The provost received the recommendations of the dean, the two committees, and the external reviewers, as well as documents related to plaintiff's application, and undertook a de novo review of the application. On April 27, 1995, the provost denied plaintiff's application for tenure.

On April 8, 1998, plaintiff filed the instant lawsuit against the dean and defendant university, alleging racial discrimination, retaliation, and tortious interference with a contractual relationship. The trial court granted summary disposition to defendant on the tortious interference claim. Defendant then moved for summary disposition of the remaining claims, arguing that those claims were barred by the three-year statute of limitations and that plaintiff had not submitted sufficient evidence to support his claims. The trial court granted summary disposition to defendant.

The Court of Appeals reversed, concluding that plaintiff had submitted sufficient evidence to support both the racial discrimination and retaliation claims. Unpublished opinion per curiam, issued April 12, 2002 (Docket No. 227726). The Court also concluded that plaintiff's claims were timely under the "continuing violations" doctrine of *Sumner v Goodyear Tire & Rubber Co*, 427 Mich 505 (1986).

Following the initial decision of the Court of Appeals, this Court overruled *Sumner* in *Garg v Macomb Co Community Mental Health Services*, 472 Mich 263 (2005). Defendant filed a new motion for summary disposition, arguing that under *Garg* plaintiff's claims were time-barred. Defendant further argued that under *Garg*, events occurring outside the statute of limitations period could not be considered as evidence to prove discrimination in regards to a timely claim. The trial court granted summary disposition to defendant, ruling that absent evidence of events outside the statute of limitations period, plaintiff had not presented sufficient evidence to support his claims.

Subsequently, this Court, on motion for reconsideration, modified *Garg* by removing footnote 14.[1] 473 Mich 1205 (2005). On this basis, the trial court then granted plaintiff's motion for reconsideration and reinstated plaintiff's case, and the Court of Appeals affirmed. Unpublished opinion per curiam, issued January 4, 2007 (Docket No. 266238).

---

[1] Footnote 14 stated that "acts falling outside the period of limitations" were inadmissible evidence even "in support of a timely claim."

## II. Standard of Review

"A trial court's ruling on a summary disposition motion is a question of law that this Court reviews de novo." *Vega v Lakeland Hospitals*, 479 Mich 243, 245 (2007). A court considering a motion for summary disposition under MCR 2.116(C)(10) must review the evidence "submitted by the parties in the light most favorable to the nonmoving party." *Brown v Brown*, 478 Mich 545, 551-552 (2007). "Summary disposition is appropriate if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *Id*. at 552.

## III. Analysis

### A. General Principles

Plaintiff argues that the dean retaliated against him for making the EOO complaint, resulting in the denial of tenure. In order to establish a prima facie claim of retaliation, a plaintiff must show:

> "(1) that he engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action." [*Garg*, *supra* at 273, quoting *DeFlaviis v Lord & Taylor, Inc*, 223 Mich App 432, 436 (1997).]

In this case, plaintiff's informal complaint to the EOO constituted a "protected activity." Moreover, the denial of tenure constituted an adverse employment action. It is clear that the dean was aware of the EOO complaint. However, even assuming that the *provost* was aware of the complaint, plaintiff's retaliation claim fails because plaintiff, in my judgment, has not shown the requisite causal connection between the protected activity and the denial of tenure.

### B. Dean

Plaintiff has not submitted sufficient proof to demonstrate that the dean retaliated against plaintiff for making the EOO complaint. The bulk of plaintiff's evidence concerns the dean's alleged change in attitude toward plaintiff. Plaintiff argues that because the dean rated plaintiff highly before the EOO complaint but criticized plaintiff's performance afterwards in his recommendation against tenure, the only inference that may be drawn is that the dean criticized plaintiff's performance simply to retaliate for the EOO complaint. Moreover, plaintiff also ascribes a retaliatory motive to the shortened contract offered by the dean in December 1993. However, this Court has stated that

"[s]omething more than a temporal connection between protected conduct and an adverse employment action is required to show causation where discrimination-based retaliation is claimed." *West v Gen Motors Corp*, 469 Mich 177, 186 (2003). In other words, the law permits a decision-maker to change his mind about an employee's performance, even after that employee has submitted a complaint regarding racial discrimination. To hold otherwise would be to inoculate an employee who makes such a complaint from ever suffering an adverse employment action. "The fact that a plaintiff engages in a 'protected activity' . . . does not immunize him from an otherwise legitimate, or unrelated, adverse job action." *Id*. at 187. *West* observed that a person could demonstrate the requisite causal connection by "present[ing] evidence that his superior expressed clear displeasure with the protected activity engaged in by the plaintiff." *Id*. at 186-187. Thus, plaintiff could demonstrate that the dean harbored retaliatory animus, either by some "expression" of "clear displeasure" in regards to the complaint or by other evidence from which a reasonable juror could conclude that the dean was displeased by the complaint.

In this case, plaintiff attempts to forge the necessary causal connection by focusing on the dean's comments in faculty meetings regarding a "sitar" and "curried lamb." Plaintiff argues that these comments constitute direct evidence of discriminatory animus by the dean; alternatively, he argues that, even if these comments are merely "stray remarks," *Sniecinski v Blue Cross & Blue Shield of Michigan*, 469 Mich 124, 136 (2003), they constitute circumstantial evidence of bias.[2]

In my judgment, these comments neither constitute direct evidence of discriminatory bias nor rise even to the level of "stray remarks" of bias. This Court has stated:

> Factors to consider in assessing whether statements are "stray remarks" include: (1) whether they were made by a decision maker or an agent within the scope of his employment, (2) whether they were related to the decision-making process, (3) whether they were vague and ambiguous or clearly reflective of discriminatory bias, (4) whether they were isolated or part of a pattern of biased comments, and (5) whether they were made close in time to the adverse employment decision. [*Sniecinski*, *supra* at 136 n 8.]

---

[2] It is unnecessary to determine here whether under Michigan's antidiscrimination laws "stray remarks" are admissible as circumstantial evidence of discrimination or whether such remarks are inadmissible as lacking relevance, see *Krohn v Sedgwick James of Michigan*, 244 Mich App 289, 302 (2001) (concluding that "stray remarks" were properly excluded as evidence because such remarks were "irrelevant"). This is because, at least in my judgment, the comments in this case do not rise to the level of reasonably suggesting discriminatory bias.

Although the dean had a role in the decision-making process of the university, the other factors are not implicated here.  The "sitar" and "curried lamb" comments were not made in relationship to the tenure decision; rather, these comments came in the midst of lengthy faculty meetings on unrelated subjects and they were not directed toward plaintiff.  These comments were isolated and limited to these two meetings.  Moreover, they took place over a year before the ultimate tenure decision was made.   Most importantly, these comments are altogether irrelevant in suggesting animus or bias on the part of the dean; rather, they are mere cultural references made to elucidate general points having nothing to do with plaintiff or his tenure, and they indicate no hostility toward persons of Asian-Indian descent or any other ethnic heritage.[3]  Accordingly, the "sitar" and "curried lamb" remarks are neither direct nor circumstantial evidence of the dean's alleged discriminatory bias.

Moreover, even if these comments could be reasonably construed to indicate discriminatory animus — which I do not believe to be so  — they must still be evaluated in light of whether they suggest any *retaliatory* animus on the part of the dean.  That is, the only pertinent question here is whether the dean disdained plaintiff specifically for making the EOO complaint and responded adversely as a result.  Absent such evidence — and there is none — plaintiff's claim of retaliation depends entirely on the temporal connection between the EOO complaint and the dean's change in attitude.  Consequently, plaintiff cannot make a prima facie case of retaliation.

## C.  Provost

Even if plaintiff could demonstrate that the dean intended to retaliate against plaintiff for filing the EOO complaint, plaintiff, in my judgment, still has not submitted sufficient evidence to create a jury question regarding causation.  That is, with regard to the tenure decision, the dean was not the ultimate decision-maker; the provost was.  Thus, plaintiff must argue either that the dean's animus may be imputed to the provost or that the dean's approval was necessary for tenure to be granted, thereby making him the de facto decision-maker.

---

[3] One can only speculate about the ways in which employers' vocabulary will have to be sanitized in order to avoid raising inferences of discriminatory bias to overly sensitive employees and judges.  Needless to say, references to "Chinese walls" in describing security systems, "kamikaze" competitive tactics, sending "smoke signals" to potential customers, "putting one's finger in the dike" in addressing emergencies, and avoiding "siestas" until a project has been completed, should, as a start, be expunged from one's vocabulary lest such references later be relied on as evidence of civil rights violations.  Particular care should also be taken to avoid references or allusions to the cuisine, customs, cultural artifacts, historical figures, and mythologies of particular ethnic groups and nationalities.

This Court has held that a plaintiff cannot bring a valid claim of discrimination where he has failed to "establish[] that the ultimate decision maker harbored any racial animus toward [the plaintiff]." *Dep't of Civil Rights ex rel Burnside v Fashion Bug*, 473 Mich 863 (2005). However, under some circumstances, courts have imputed the bias of non-decision-makers to the ultimate decision-maker. See, e.g., *Harrison v Olde Financial Corp*, 225 Mich App 601, 609 n 7 (1997). The United States Court of Appeals for the Seventh Circuit has stated that bias may be imputed when the "decision makers themselves, or those who provide input into the decision, express such feelings (1) around the time of, and (2) in reference to, the adverse employment action complained of." *Hunt v City of Markham*, 219 F3d 649, 652 (CA 7, 2000). In such circumstances, "it may be possible to infer that the decision makers were influenced by those feelings in making their decision." *Id*. at 653. On the other hand, discriminatory intent should not be imputed to the ultimate decision-maker when that decision-maker consulted various persons in making the decision, one of whom had allegedly uttered a discriminatory remark, because generally "[s]tatements made by inferior employees are not probative of an intent to discriminate by the decisionmaker." *Aungst v Westinghouse Electric Corp*, 937 F2d 1216, 1221 (CA 7, 1991).

Here, plaintiff has not produced evidence that the dean made any allegedly retaliatory remarks about plaintiff to the provost "around the time of" the tenure decision. The comments about the "sitar" and "curried lamb" were made over a year before the provost's decision, were not in reference to the tenure decision, and were not made to or in the vicinity of the provost. Moreover, defendant produced considerable evidence that the provost's decision was based not only on the dean's recommendation, but also on the recommendations of two separate committees, as well as outside recommendations from solicited reviewers and other independent materials. Hence, any retaliatory bias on the part of the dean may not be properly imputed to the provost.

Nor is there evidence that the provost here "acts merely as a cat's paw for or rubber-stamps a decision, report, or recommendation actually made by a subordinate," or that the dean is "the actual decisionmaker or the one principally responsible for the contested employment decision." *Hill v Lockheed Martin Logistics Management, Inc*, 354 F3d 277, 290 (CA 4, 2004). Plaintiff asserts that because the provost could not remember a specific faculty member who was given tenure over a dean's recommendation of denial (although the provost testified that it had occurred), sufficient evidence has been presented that the dean was the actual decision-maker. However, it is not defendant's burden to produce some statistical minimum of cases in which tenure decisions have been made by the provost over the dean's objections. Simply put, there is no obligation on the part of a decision-maker to show some minimum number of disagreements with a subordinate in order to demonstrate that she, and not the subordinate, is, in fact, the decision-maker. Here, the provost stands in a clearly superior decision-making position in defendant's hierarchy relative to the dean; it is

uncontradicted that the provost considered recommendations of persons and committees from other than the dean, and it is uncontradicted that the provost conducted a de novo review of each tenure application and reached an ultimate conclusion based on all the material submitted to her. Under these circumstances, I do not believe that plaintiff has created a genuine issue of material fact regarding whether the provost was the "actual decision-maker" with regard to his failure to achieve tenure.

### D. Amendment of *Garg*

Defendant also asserts that, even if plaintiff's claims are allowed to proceed to trial, plaintiff may not present evidence of events that occurred outside the statute of limitations period under *Garg*. Unfortunately, the majority simply ignores this issue. The significance of this Court's action in *Garg* in granting plaintiff's motion for reconsideration and striking the original footnote 14 is squarely implicated in this case if it must proceed to trial, as required by the majority. I agree with the Court of Appeals that "the implications of *Garg* are unclear with respect to the admission of evidence." This Court should not require this trial to proceed where the scope of admissible evidence is unclear and where this issue has squarely been presented to this Court. It makes no sense for this trial to proceed before its ground rules can be determined.

### IV. Conclusion

The practical effect of the majority's order will be: (a) to increasingly immunize persons who have filed complaints of discrimination from subsequent adverse employment actions and thereby encourage baseless filings of discrimination by giving greater weight to mere temporal relationships in assessing whether discrimination has occurred; (b) to inject courts more deeply into the business of monitoring what is, at most, insensitive speech rather than speech evidencing discriminatory bias; (c) to throw into confusion the identity of the actual decision-maker in the employment process upon whom evidence of bias must be focused; and (d) to cast doubt upon the integrity of a growing number of discrimination trials by failing to clarify under *Garg* the proper scope of admissible evidence in such trials. The decisions of this Court have consequences and such consequences cannot be disclaimed by the majority simply because a decision is issued by order rather than by opinion.

For the reasons set forth in this statement, I would reverse the judgment of the Court of Appeals and dismiss the remaining claims against defendant.



I, Corbin R. Davis, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

March 7, 2008

_Corbin R. Davis_
Clerk

t0304