NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0681n.06
Filed: November 6, 2008

No. 07-2215

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

JEAN CALDERON )
)                        ON APPEAL FROM THE
*Plaintiff-Appellant*, )                        UNITED STATES DISTRICT
)                        COURT FOR THE EASTERN
v. )                        DISTRICT OF MICHIGAN
)
FORD MOTOR CREDIT CO. )                        **O P I N I O N**
)
*Defendant-Appellee*. )
)

BEFORE:    MOORE, COLE, Circuit Judges; and GRAHAM,[*] District Judge.

**COLE, Circuit Judge.**   Plaintiff-Appellant, Jean Calderon ("Calderon"), sued her former

employer, Defendant-Appellee Ford Motor Credit Co. ("Ford Credit"), alleging, among other things,

hostile-work-environment harassment in violation of  Michigan's Elliott-Larsen Civil Rights Act

("ELCRA"), Mich. Comp. Laws § 37.2101, et seq.  The district court granted summary judgment

to Ford Credit, finding that Calderon could not establish respondeat superior on her hostile-work-

environment claim and that the ELCRA statute of limitations bars consideration of pre-limitations

period conduct.  Calderon now appeals.  For the reasons set forth below, we **REVERSE** the district

court's grant of summary judgment and **REMAND** for further proceedings consistent with this

opinion.

---

[*]The Honorable James L.  Graham, United States District Judge for the Southern District of
Ohio, sitting by designation.

## I. BACKGROUND

**A.      Factual History**

Calderon began working for Ford Credit as a switchboard operator in June 1999.  She was subsequently promoted to Head Title Clerk.   Throughout her employment, Calderon had the following supervisors: Jennifer Schallhorn supervised Calderon from September 2001 to January 2002;  Liz Polterdyke supervised Calderon from January 2002 to July 2002;   John Carr was Calderon's supervisor from July 2002 to October 2002 and then again from February 2003 to May 2003; and Maxine Smith supervised Calderon from October 2002 to February 2003 and again from May 2003 to June 2003.  While working for Ford Credit, Calderon alleges that she was subjected to harassment based on her race and national origin, which resulted in a hostile work environment. Calderon alleges that the harassment began shortly after she began working for Ford Credit.

In 1999, co-worker Rose Seifers told Calderon not to speak Spanish, to "go back to her own country," and that "she didn't need...any fucking Mexican on her job." (Joint Appendix ("JA") 62.) Calderon also received anonymous phone calls from co-workers making derogatory statements regarding her speaking Spanish in the work place.  Calderon complained to Human Resources.  In response to Calderon's complaints, Calderon's supervisor Jennifer Cornea investigated the matter and found that Seifers had made the inappropriate phone calls to Calderon.  In response, Calderon's supervisors apologized to Calderon and also made Seifers apologize to her.  Calderon's complaint was handled to her satisfaction, except in one respect.  Calderon testified during her deposition that supervisor Hale Houts told her that although Ford Credit had a zero tolerance discrimination policy,

she should not report the harassment to Human Resources. Houts indicated that Calderon could be fired if she made a report because Seifers had a longer history with the company and, as such, was more likely to be believed than Calderon. After Seifers apologized, she and Calderon became friends. Calderon had no further problems with Seifers.

In September 2001, two Ford Credit supervisors, Liz Polterdyke and Jennifer Schallhorn made derogatory remarks about Calderon's race and national origin during a disagreement with Calderon about work assignments. Polterdyke stated, "you people ought to know better," "you people should be used to this," and "you're nothing but a taco." (JA 360.) Similarly, Schallhorn referred to Calderon as "you people," and informed her that "Mexicans should take a double load, because they are good for hard work." (JA 95.) Calderon never reported these comments.

On October 3, 2001, Calderon wrote a letter to Brenda Murphy in Human Resources indicating that she was being mistreated by Schallhorn and Polterdyke. The letter did not specifically allege race or national origin discrimination. Rather, it generally indicated that Calderon's supervisors made unreasonable demands, set impossible tasks and deadlines, and treated her "inhumanely." The letter does mention, among other things, that "[Calderon] may be of a different ethnic race, or grade level, but [she] [] deserve[s] to be treated with some dignity." (JA 137.) After receiving the letter, Murphy allegedly met with Schallhorn, Polterdyke, and Calderon. During the meeting, Murphy told both Schallhorn and Polterdyke that harassing behavior would not be tolerated. Calderon alleges that during that meeting Murphy also told Polterdyke and Schallhorn that if Murphy had to address any harassing issues between the three again, Polterdyke and Schallhorn would be fired. Calderon agreed that following the meeting, Schallhorn made no further derogatory remarks.

Later, in December 2002, Polterdyke allegedly called Calderon a "fucking spic" during a meeting with Ford Credit's Branch Operations Manager, Marc Honse. Calderon maintains that she complained to Melanie Leavy in human resources, that she was having problems with Polterdyke and that Polterdyke uttered this epithet. Shortly thereafter, another Ford Credit supervisor, Ed Sweda ("Sweda"), told Calderon that he had learned from Human Resources that she had complained about Polterdyke's offending remark. He further stated that he did not want Calderon to complain to Human Resources about his managers.

Also, in December 2002 or January 2003, Maxine Smith ("Smith") pulled Calderon into an office and told her that she could not attend a department luncheon with the other employees because "[she] was not welcome"; "they [did not] want her there"; "[she did not] fit in"; and finally, "[that] they didn't want [] Mexicans there." (JA 373.)

Sometime in early 2003, Ford Credit Ed Sweda gathered employees on the office floor after another branch had sent the department straw hats. Upon noticing that the hats were made in Mexico, Sweda said "oh, here's one thing you and your people do well is make hats. Maybe, you ought to stay with that type of career." (JA 381.) He then asked, "where's my little Mexican bean?" (*Id*.)

On May 16, 2003, Calderon attended a meeting with Polterdyke, Smith and John Carr, a Ford Credit supervisor, to discuss a work assignment. During the meeting, Polterdyke allegedly began yelling at Calderon because Calderon had not yet completed a project. Polterdyke then slammed her hands on the desk and told Calderon, "who the hell are you looking at, you don't look at me that

way[.] [Y]ou're not White enough. You look down when I talk to you." (JA 370.) Smith and Carr then escorted Calderon out of the office and tried to calm her down.

Calderon alleges that the very next day, Carr promised Calderon's co-worker, Geralyn Kinsman, a promotion if Kinsman would write an affidavit accusing Calderon of bothering her and of interfering with her work. On May 21, 2003, Kinsman wrote a letter to Ford Credit's Human Resources accusing Calderon of interfering with her work. In the letter, Kinsman stated, among other things, that Calderon told her on May 15, 2003, that "supervisors [] harass and threaten her[;] examples: someone calls her from an outside phone and calls her a spic...(Mexican)." (JA 161.) Calderon's co-worker Cynthia Ricks testified that Kinsman told her that Carr had asked her to complain about Calderon in exchange for a promotion, a claim Kinsman denies.

Then, on June 2, 2003, Sweda called Calderon into his office and told her that Leavy had informed him that Calderon had complained to Human Resources about Polterdyke's 2002 racial slur. Sweda also informed her that he had a written affidavit from Kinsman complaining that Calderon would not allow Kinsman to do her work. He further allegedly stated that "she was a little shit that went up against his managers in the past and [she] wasn't going to do it to him." (JA 370-71.) Sweda indicated that he would not allow her to report him to Murphy as Calderon had with Polterdyke and Schallhorn. Calderon also testified that Sweda stated "as long as he was branch manager [] his supervisors could say whatever they wanted to [Calderon]"). (*Id.*)

As she was leaving Sweda's office, Calderon began to suffer an asthma attack. She left the office and sought medical attention. On June 2, 2003 Calderon took a medical leave due to a chronic

asthma condition. Calderon was subsequently terminated effective July 2, 2003 for failing to report to work or to justify her absence.

**B.      Procedural History**

On June 15, 2005, Calderon filed suit in federal district court, alleging that Ford Credit: (1) unlawfully terminated and retaliated against her in violation of the Family Medical Leave Act ("FMLA"), 29 U.S.C.A. § 2601, et seq. (count I); (2) unlawfully discriminated against her because of her race and national origin and unlawfully retaliated against her for complaining about race and national origin discrimination and harassment, collectively, count (II); and (3) intentionally inflicted emotional distress on her, (count III). Although Calderon did not specifically plead a count of a hostile-work-environment harassment based on race and national origin, the district court and the parties interpreted her complaint as stating such a claim.

After hearing oral argument on Ford Credit's motion for summary judgment, the district court granted Ford Credit summary judgment on all claims, and dismissed the complaint with prejudice. Initially, Calderon's appellate brief indicated that she challenged the district court's grant of summary judgment on her hostile work environment and retaliation claim, without specifying which — either ELCRA or FMLA — retaliation claim. However, at oral argument, Calderon's counsel indicated that, on appeal, Calderon challenges only the district court's grant of summary judgment on her hostile work environment claim.

### III.  JURISDICTION

The district court had jurisdiction over Calderon's federal claims pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over the state claims under 28 U.S.C. § 1367.  We have appellate jurisdiction over the district court's final order pursuant to 28 U.S.C. § 1291.

### IV.  ANALYSIS

**A.    Standard of Review**

We review the district court's grant of summary judgment de novo.  *Miller v. Admin. Office of the Courts*, 448 F.3d 887, 893 (6th Cir. 2006).  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the  moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *see also* Fed. R. Civ. P. 56(e).  We must view all facts and inferences drawn therefrom in the light most favorable to the nonmoving party.  *See LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The moving party bears the initial burden of proving that there are no genuine issues of material fact for trial.  *Celotex*, 477 U.S. at 322-23.  "Once the movant has satisfied its burden, the nonmoving party must produce evidence showing that a genuine issue remains."  *In re Rodriguez*, 487 F.3d 1001, 1007 (6th Cir. 2007).

**B.    Hostile Work Environment**

Ford Credit makes three arguments regarding Calderon's hostile-work-environment harassment claim: (1) evidence of events that predate Michigan's Civil Rights statute of limitations are precluded and may not be used to constitute a harassment claim; (2) Calderon cannot

demonstrate severe and pervasive harassment; and (3) Calderon cannot establish respondeat superior liability.

### 1. Statute of Limitations

The first issue before us is whether Calderon is precluded from using evidence of events outside the ELCRA's statute of limitations period to establish a hostile work environment claim. Generally, a suit cannot be based upon actions that occurred prior to the limitations period of a claim. A hostile-work-environment harassment claim under the ELCRA must be filed within three years of the time it accrued. Mich. Comp. Laws § 600.5805(10). If the three-year statute of limitations period applies, it would exclude Calderon from recovering for any discrimination she faced prior to June 15, 2002.

On appeal, Calderon argues that she may rely upon evidence outside the ELCRA three-year statute of limitations period to establish a prima facie hostile work environment claim under Michigan State law. In *Sumner v. Goodyear Tire & Rubber Co.*, 398 N.W.2d 368, 381 (Mich. 1986), the Michigan Supreme Court held that the continuing violation doctrine applied to claims brought under the ELCRA. Under that doctrine, a plaintiff may recover for incidents that occur outside the applicable limitations period if she asserts an ongoing string of discriminatory actions or statements that are so sufficiently related that they constitute a pattern of harassment or discrimination and at least one of the acts occurred within the limitations period. *Id.* at 538-39, *overruled in part by*, *Garg v. Macomb County Cmty. Mental Health Servs.*, 696 N.W.2d 646, 659 (Mich. 2005). If a "continuing violation" is shown, a plaintiff is entitled to have a court consider

all relevant actions allegedly taken pursuant to the employer's discriminatory policy or practice, including those that would otherwise be time-barred. *Id*.

Later, in *Garg*, 696 N.W.2d at 659, the Michigan Supreme Court abrogated the doctrine in a retaliation case brought under the ELCRA. In *Garg*, the Court specifically held that "a person must file a claim under the Civil Rights Act within three years of the date his or her cause of action accrues, as required by § 5805(10)." *Id*. The original *Garg* opinion contained a footnote (footnote fourteen), which stated "acts falling outside the period of limitations were inadmissible evidence in support of a timely claim." *Ramanathan v. Wayne State Univ. Bd. of Governors*, 745 N.W.2d 115, 118 n.1 (Mich. 2008) (Markman, J. dissenting) (internal quotations omitted). However, the Michigan Supreme Court amended *Garg* by removing this footnote. *See Garg v. Macomb County Cmty. Mental Health*, No. 95-003319, 2005 Mich. LEXIS 1146 (Mich. July 18, 2005). Thus, an open question remains as to whether acts falling outside the three-year statute of limitations may be used as evidence of hostile work environment.

We need not resolve this issue because Calderon waived this argument by failing to raise it before the district court. *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546 (6th Cir. 2008) (citations omitted) (noting arguments not raised before the district court in connection with a summary judgment motion are waived on appeal to this Court). Moreover, Calderon's counsel affirmatively stated at oral argument that she was not relying on pre-limitations period acts.

### 2. Severe and Pervasive Conduct

The Court now looks to whether Calderon has provided evidence of events occurring within the limitations period that are sufficiently severe or pervasive to create a hostile work environment.

Although the district court did not address this issue, we conclude that the incidents occurring within the statute of limitations period (June 15, 2002 to June 15, 2005) create a genuine issue of material fact as to the existence of a hostile work environment. The ELCRA provides that an employer shall not "[d]iscriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status." Mich. Comp. Laws Ann. § 37.2202(1)(a). Harassment in the workplace based on race or national origin is an actionable offense. *See Malan v. Gen. Dynamics Land Sys., Inc.*, 538 N.W.2d 76, 77 (Mich. Ct. App. 1995) (holding "[h]arassment based on any one of the enumerated classifications [in the ELCRA] is an actionable offense.").

To establish a prima facie claim under the ELCRA on a theory of a hostile work environment, a plaintiff must establish that: "(1) the employee belonged to a protected group; (2) the employee was subjected to communication or conduct on the basis of her protected status; (3) the employee was subjected to unwelcome . . . conduct or communication involving her protected status; (4) the unwelcome . . . conduct was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment; and (5) respondeat superior." *In re Rodriguez*, 487 F.3d 1001, 1010 (6th Cir. 2007) (internal brackets omitted) (quoting *Quinto v. Cross & Peters Co.*, 547 N.W.2d 314, 319-20 (Mich. 1996)). The first three elements are not disputed. Hence, the focus of our review is on whether the unwelcome conduct created a hostile environment and whether Calderon established respondeat superior. "To survive summary disposition, a plaintiff must present documentary evidence to the trial court that a genuine issue exists regarding whether a reasonable person would find that, in the totality of the

circumstances, the unwelcome conduct was sufficiently severe or pervasive to create a hostile work environment." *In re Rodriguez*, 487 F.3d at 1010 (internal quotation marks and brackets omitted) (quoting *Quinto*, 547 N.W.2d at 320).

A hostile work environment exists "when the work-place is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks and citations omitted). Courts must consider the totality of the circumstances to determine whether the environment is both objectively hostile, such that a reasonable person would find it hostile, and subjectively hostile, such that the victim regarded it as hostile. *Radtke v. Everett*, 501 N.W.2d 155, 167 (Mich. 1993). Factors used to determine if the claimed misconduct is sufficiently severe or pervasive to constitute a hostile work environment "include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. However, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks and citation omitted).

Calderon does not contend that any one incident was so traumatic, that it, in itself, created a hostile work environment; rather, she argues that in the aggregate, all of the racial slurs, comments, and conduct created a hostile work environment. We conclude that under the totality of the circumstances, there is a genuine issue of material fact as to whether a reasonable person would have

perceived the conduct at issue as creating an intimidating, hostile, or offensive work environment.

Calderon contends that the four following incidents occurring within the statute of limitations period (June 15, 2002 to June 15, 2005) created a hostile work environment: (1) Polterdyke's December 2002 reference to Calderon as a "fucking spic"; (2) Smith's December 2002 or January 2003 statement that Calderon could not attend a department lunch because "they [didn't] want [] Mexicans"; (3) Sweda's early 2003 remark that "[Calderon's] people" make straw hats well and asking her "where's my little Mexican bean"; (4) Polterdyke's May 16, 2003 admonition "[not] look at [her] that way, you're not white enough, you look down when I speak to you."

Although the parties do not address other evidence of alleged race and/or national origin discrimination in the record, this additional evidence is relevant to our analysis of whether a hostile work environment existed at Ford Credit. In addition to the alleged four incidents above, Ricks testified during her deposition that co-workers teased Calderon because of her accent every time she spoke. Most importantly, evidence that may not have been explicitly accompanied by a racial or national origin slur may still contribute to a hostile work environment. *See Jackson v. Quanex Corp.*, 191 F.3d 647, 662 (6th Cir. 1999) ("[E]ven though a certain action may not have been specifically racial in nature, it may contribute to the plaintiff's proof of a hostile work environment if it would not have occurred but for the fact [of the plaintiff's protected status]."). For example, as the second incident above notes, Calderon was told on at least one occasion that she could not attend a work luncheon specifically because her supervisors did not want Mexicans to be present. A factfinder could easily infer that Calderon was excluded from other luncheons because of her race and national origin. *See id*. at 662 ("[A] showing of use of racial epithets in a work environment

may create an inference that racial animus motivated other conduct as well."). Thus, Calderon's testimony that only she was not allowed to attend any departmental luncheons or participate in Christmas lunches is probative of whether a hostile work environment existed at Ford Credit.

Likewise, evidence that Carr was instructed to "ride" Calderon is probative of whether a hostile work environment existed. Polterdyke allegedly told Carr to "ride" Calderon, and Carr explained to Calderon that his almost daily meetings with her were the result of Polterdyke's order.

Moreover, Polterdyke's September 2001 and December 2002 derogatory statements about Calderon's race and national origin were made during meetings to discuss work assignments and the statements were occasioned by what Polterdyke considered to be Calderon's inability or unwillingness to perform her job duties. Although Carr did not specifically refer to Calderon's race or national origin during these meetings, the surrounding context of Polterdyke's harassment based explicitly on race and national origin could allow a factfinder to infer that Carr's actions were taken on account of Calderon's race and national origin. *See Oncale v. Sundowner Offshore Servs. Inc.*, 523 U.S. 75, 81-82 (1998) ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed."). The record indicates that Calderon was singled out for other discriminatory treatment because of her race and national origin. Although various employees submitted affidavits stating that Polterdyke treated everyone poorly, there is no evidence that everyone was subjected to daily meetings with supervisors, excluded from departmental lunches, or otherwise excluded. This evidence raises a genuine issue of material fact as to the existence of a hostile work environment.

Although it may be that no one incident of harassment in this case is sufficient to establish severe or pervasive harassment, when considered together and viewed in the light most favorable to Calderon, the evidence shows a pattern of ridicule and treatment sufficient for a jury to conclude that there existed a severe and hostile work environment. Thus, a reasonable jury could find that under the totality of the circumstances, Calderon was subjected to conduct that was sufficiently severe and pervasive to create a hostile work environment.

### 3. Respondeat Superior

Calderon has also raised a genuine issue of material fact pertaining to respondeat superior. Employer responsibility for harassment can be established only if the employer had reasonable notice of the harassment and failed to investigate adequately claims of harassment and take prompt and appropriate remedial actions. *Elezovic v. Ford Motor Co.*, 697 N.W.2d 851, 861 (Mich. 2005); *Radtke*, 501 N.W.2d at 168-69. Notice is adequate if, under the totality of the circumstances and viewing the circumstances objectively, a reasonable employer would have known that there was a substantial probability that an employee was being harassed. *Chambers v. Trettco, Inc.*, 614 N.W.2d 910, 919 (Mich. 2000). "Thus actual notice to the employer is not required; rather the test is whether, [under the totality of the circumstances,] the employer knew or should have known of the harassment." *Elezovic*, 697 N.W.2d at 426 (citation omitted). Accordingly, the required notice may be actual or constructive.

Calderon does not contend that she gave Ford Credit actual notice of the alleged harassment; rather, she argues that Ford Credit had constructive notice of the harassment. Constructive notice may be demonstrated "by showing the pervasiveness of the harassment, which gives rise to the

inference of knowledge or constructive knowledge." *Sheridan v. Forest Hills Pub. Sch.*, 637 N.W.2d 536, 621 (Mich. 2001) (citing *Hartleip v. McNeilab, Inc.*, 83 F.3d 767, 776-77 (6th Cir. 1996)).

We conclude that Calderon has raised a genuine issue of material fact as to whether Ford Credit should have known of the harassment because of its pervasive nature. The record demonstrates that under the totality of the circumstances, a reasonable jury could conclude that Ford Credit should have been aware, like its workers and supervisors were actually aware, of the derogatory racial remarks made about and to Calderon. Ricks testified that co-workers commonly referred to Calderon as "spic" or "Mexican spic," and teased Calderon about her accent in Ford Credit's office. Moreover, many supervisors also referred to Calderon as a "spic" or used similar derogatory language when speaking to her. For example, branch operations manager Hunt allegedly overheard Polterdyke's 2003 "you're not white enough" comment. Supervisor Sweda's 2003 "Mexican bean" comment was allegedly made on Ford Credit's office floor, in front of other employees. Viewing the evidence in the light most favorable to Calderon, the record demonstrates that Calderon was frequently referred to as a "spic," or by other derogatory language in Ford Credit's offices during the applicable time period. Accordingly, we conclude that this harassment was so pervasive as to, under the totality of the circumstances, place a reasonable employer on constructive notice of a substantial probability that harassment was occurring.

Further, the record demonstrates that neither Ford Credit's management nor human resources ever responded to the slurs or took prompt remedial action to end the harassment. According to the Michigan Supreme Court in *Chambers*, the relevant inquiry is "whether the action reasonably served to prevent future harassment of the plaintiff." *Chambers*, 614 N.W.2d at 919. The appropriate

corrective response will vary according to the frequency and severity of the alleged harassment. *Bell v. Chesapeake & Ohio Ry. Co.*, 929 F.2d 220, 224 (6th Cir. 1991). There is no evidence that Ford Credit took any action to prevent its employees from engaging in harassment of Calderon. Accordingly, we cannot say that Ford Credit's actions reasonably serve to prevent future harassment. Calderon, therefore, may be able to establish respondeat superior liability.[1] Therefore, we hold that summary judgment in favor of Ford Credit on the hostile-work-environment claim was improper.

## V. CONCLUSION

For the reason discussed above, we **REVERSE** the district court's judgment and **REMAND** for further proceedings consistent with this opinion.

---

[1]Calderon further contends that because her harassers were Ford Credit's "agents," Ford Credit is strictly liable for their conduct. As previously explained, issues raised for the first time on appeal are typically not considered by this Court absent exceptional circumstances. *Foster v. Barilow*, 6 F.3d 405, 407 (6th Cir. 1993) (citations omitted); *Scottsdale Ins. Co.*, 513 F.3d at 552-53. At the district court level, however, Calderon consistently argued that respondeat superior is established by the severe and pervasive nature of the alleged harassment. Having raised a different argument before the district court, Calderon has failed to present support, reasoning, case law, or facts to support her argument that Ford Credit is strictly liable for the alleged harassment of its agents. Thus, we hold that Calderon waived this argument on appeal.