**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 15a0278n.06

Case No. 14-5618

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Apr 14, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| STEPHEN HENRY, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE MIDDLE DISTRICT OF |
| FEDERAL RESERVE BANK OF | ) | TENNESSEE |
| ATLANTA, | ) | |
| | ) | OPINION |
| Defendant-Appellee. | ) | |
| | ) | |

BEFORE: GILMAN, ROGERS, and SUTTON, Circuit Judges.

SUTTON, Circuit Judge. Stephen Henry worked for many years in the Nashville office of the Federal Reserve Bank of Atlanta. In 2010, the bank decided to close the Nashville office, prompting layoffs of nearly all employees in the office by July 31, 2011. Henry was laid off a few months before the office closed (in May 2011) but received full pay and benefits through July 2011. In his view, the bank laid him off two months early based on discrimination against his religious beliefs, prompting him to sue the bank for creating a hostile work environment and for retaliating against him when he complained about it. The bank responds that it never treated him differently on account of his faith and never subjected him to a hostile work environment. The district court granted summary judgment in the bank's favor. We affirm.

Stephen Henry considers himself a "priest in the Christian religion affiliated with Israel." R. 34-10 at 93. His Christian "values and guidelines for behavior," he explains, "often conflict with those of modern culture." *Id.* at 118. And his behavior, he adds, sometimes conflicted with the expectations of his colleagues. All the same, he distinguished himself as a law enforcement officer in the Nashville office of the Federal Reserve Bank of Atlanta, where he had worked since 2004.

In 2010, the Atlanta Federal Reserve announced that it would close the Nashville office, putting an imminent end to his career there. It planned to lay off nearly everyone in the building on July 31, 2011, keeping just a few experienced employees to facilitate the transition. Like most of his coworkers, Henry did not make the cut.

Unlike most of his coworkers, Henry had other workplace-related troubles. He asserts that his colleagues went out of their way to persecute him on account of his faith. They displayed their middle finger in his vicinity at least five times: while holding paper, using a computer mouse, pointing at his computer screen, and twice while touching their foreheads. One colleague accused him of "covetousness," another of being overly focused on "productivity." R. 34-10 at 102–03. Two others mentioned something about setting him up to "wreck his truck," although nothing of the sort ever happened. R. 30-3 at 58. His supervisor at one point seemed "slightly agitated" when he begged off of an optional breakfast meeting, *see* R. 34-10 at 103, and at another point gave him an odd stare when he walked into a room, *see* R. 30-3 at 61. An otherwise positive performance review described him as "rigid" during "interpersonal exchanges." R. 34-10 at 104. One time he discovered that someone had moved some shirts he had put on top of his locker so that they hung a few inches over the edge.

Henry found off-duty phone calls especially aggravating because they "interrupt[ed] his ministry." R. 34-7 at 121. In 2010, as a result, the bank agreed not to call him outside working hours unless a "clear operational need" arose. *Id.* at 28, 65. His coworkers allegedly ignored that agreement twice: once to ask him his shirt size for an order that had to be submitted before he returned to the office, and once to tell him about a last-minute uniform change. Henry filed internal grievances with the bank after each call, alleging religious discrimination.

The bank hired an outside consultant, Dr. Carol Beavers, to address the conflicts between Henry and his coworkers. Beavers recommended that Henry be placed on paid administrative leave pending an investigation into his complaints. Henry was "agreeable" to the idea of staying out temporarily but was "adamant" that he wanted to work until the branch shut its doors. R. 34-6 at 93. The bank's investigation ended on May 17, 2011, and turned up no evidence of untoward behavior toward Henry. Henry filed a religious discrimination charge with the Equal Employment Opportunity Commission one day later.

The end of the investigation put the bank to a choice: to lay off Henry on schedule on July 31 or to lay him off early. Unsure how to eliminate the tension between Henry and his coworkers, the bank created a compromise. On the one hand, it laid him off on May 31, two months before the complete layoff took effect. On the other hand, it treated him as if he had been laid off on schedule: It paid him as if July 31 were his last day of work, it extended his health insurance coverage through those two extra months, and it offered him a severance package identical to the one every other bank employee received. Henry rejected the package and filed a second EEOC charge, this one alleging that his firing constituted unlawful retaliation for his first charge. When the EEOC declined to act on either charge, he sued the bank in federal

3

district court. The district court rejected his claim as a matter of law and granted summary judgment to the bank.

*Hostile Work Environment.* Title VII outlaws religious discrimination in the workplace. But it does not set forth a "general civility code," and it does not protect employees from the "ordinary tribulations" accompanying run-of-the-mine, if sometimes petty, social interactions. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). The Act thus targets conduct that "unreasonably interfere[s] with [an employee's] work performance by creating an intimidating, hostile, or offensive work environment." *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999).

The indignities that Henry claims to have suffered fall short of that bar. Here is the sum total of them: some stray gestures and glances, a few scattered comments and calls, and one mysteriously moved stack of shirts. Offensive though these incidents may have seemed to him, they do not paint a picture of an environment creeping with anti-Christian sentiment. They are better seen as the fruits of "ordinary workplace friction" that no reasonable juror could deem "severe or pervasive." *Warf v. U.S. Dep't of Veterans Affairs*, 713 F.3d 874, 878 (6th Cir. 2013).

Henry tries to head off this conclusion by emphasizing that he has documented "at least thirty-five (35) incidents of hostility," a refrain made in his submissions to the district court as well. *See* Appellant's Br. at 7, 16, 32; R. 34-3 at 2, 4. The trouble is, he does not tell us the rest of the incidents on that list, and on summary judgment we cannot credit what we cannot see.

Henry separately argues that his case cannot be distinguished from our unpublished decision in *Calderon v. Ford Motor Credit Co.*, 300 F. App'x 362 (6th Cir. 2008). He is wrong. There, supervisors called Calderon a "f[***]ing spic," barred her from a department lunch because "they [didn't] want [ ] Mexicans" there, remarked that Mexicans "make straw hats," asked her for a "little Mexican bean," and ordered her to "look down" when spoken to because

she wasn't "white enough" to look up. *Id.* at 369 (second and third alterations in original). Those facts differ from these facts in degree and kind. The district court correctly rejected Henry's hostile-work-environment claim as a matter of law.

*Retaliation.* Title VII bars employers from retaliating against their employees for reporting discrimination in the workplace. To prevail on this claim, Henry must first make out a prima facie case of retaliation by showing (among other things) that the bank took an "employment action adverse" to him because of his protected Title VII activity. *See Nguyen v. City of Cleveland*, 229 F.3d 559, 562–63 (6th Cir. 2000). If the bank offers a legitimate and nonretaliatory reason for that action, Henry must prove that its reason amounted to a pretext for unlawful retaliation. *See Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 707 (6th Cir. 2008).

Henry's retaliation charge to the EEOC mentions only one employment action: the bank's decision to fire him on May 31, 2011, two weeks after he filed his first EEOC charge and two months before the bank's long-scheduled closure. The parties disagree about whether that decision was adverse. We need not resolve the point because Henry has no answer to the bank's legitimate justification: It could not accommodate his demands that the bank restructure its work environment to rid him of occasional off-duty phone calls, the specter of shirt-moving, and other self-perceived slights. Rather than reorient its soon-to-be-shuttered office around Henry's demands for two months, the bank decided to release him early but pay him in full. That is known as a compromise—indeed, an eminently fair accommodation given that so few of Henry's complaints seem to have anything to do with his faith. At all events, that action had nothing to do with the EEOC charge and everything to do with administrative convenience. Because there was nothing pretextual about what the bank did, Henry cannot prevail.

Henry protests that an e-mail penned by Dr. Carol Beavers, the outside consultant, casts doubt on the bank's explanation. Here is what it says:

> Did have the call with [Henry]. I was not successful in persuading him to take an early out. He says there are "procedures" and he intends to follow them. Is adamant about not leaving before the Branch closes. I've discussed with [the chief of the law enforcement unit] and I'm not giving up. After [the chief] discusses the policies . . . I want him to call [Henry] and tell him that he needs to be out on leave another two weeks. I'm hoping that, combined with the probability of a required fitness for duty evaluation, will begin to persuade him to take the easy way out. Unfortunately, [the chief] says this "digging in" is entirely consistent with his behavior at work.

R. 34-6 at 96. From this document—written more than a month before Henry filed his first EEOC charge—Henry deduces that the bank retaliated against him for invoking "procedures." Appellant's Br. at 20. To the contrary, it adds credence to what the bank says. As the e-mail's second sentence makes plain, the bank was trying to get Henry to "take an early out" before he ever filed an EEOC charge, indeed before he ever invoked the specter of "procedures." R. 34-6 at 96. That is because the bank had already decided it could not reasonably accommodate Henry's demands. Beavers' notes hammer home the point. Two days before learning of Henry's desire to follow "procedures," Beavers and her boss discussed "strateg[ies] for communicating with [Henry] and *keeping him out of work*." *Id.* at 93 (emphasis added). That order of events confirms that the bank wanted to keep Henry out of the office well before he went to the EEOC—as the EEOC itself pointed out when rejecting his charges.

Henry adds five other allegedly retaliatory actions the bank took against him. He faults the bank for (1) threatening him with a mental-fitness evaluation, (2) denying him information about job openings at other branch offices, (3) offering him a more generous severance package in exchange for a damages release, (4) placing him on paid leave, and (5) refusing to let him continue working past July 31, 2011. Unfortunately for him, he forfeited all five arguments by

not presenting them to the EEOC to evaluate in the first instance. *See Vinson v. Ford Motor Co.*, 806 F.2d 686, 688 (6th Cir. 1986).

They do him no good in any event. Henry's first and second arguments fail because he can point to no evidence proving that the alleged events happened. The bank did not accept Beavers' recommendation that Henry be subjected to a mental-fitness evaluation. It indeed never mentioned the possibility to Henry. Nor does he have proof that the bank denied him information about job openings. In point of fact, it offered him "special assistance from a professional outplacement firm to help [him] with [his] external and internal job search." R. 34-10 at 48. True, four of his colleagues transferred to other postings before the Nashville branch shut down. But nothing in the record suggests that those positions opened up while Henry was out on paid leave or that Henry was ever interested in "pursu[ing] any transfers or reassignments." R. 30-3 at 21.

Henry's third argument fails because it is not an "adverse employment action." Companies may offer a more generous severance package to an employee who waives *both* his right to file an EEOC charge *and* his right to any damages that might result. *See EEOC v. SunDance Rehab. Corp.*, 466 F.3d 490, 500–01 (6th Cir. 2006). Here, the bank offered Henry a more generous severance package in exchange for a damages waiver alone. If the broader release is not actionable retaliation, we cannot see how the narrower release is, particularly when the bank made an identical offer to every employee it laid off.

Henry's last two arguments fail for lack of causation. The bank decided to place Henry on paid leave about two months before he filed his first charge with the EEOC. And it decided to exempt certain law enforcement officers from the July 2011 layoffs about five months before

7

that first charge. Plans developed well before Henry's EEOC activity could not have been devised in retaliation for his EEOC activity.

For these reasons, we affirm.